Argued and submitted December 16, 2009, decision of Court of Appeals reversed, judgment of circuit court affirmed February 11, 2010

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## THOMAS GREGORY MACHUCA,
*Respondent on Review.*

(CC 050647097; CA A133362; SC S057910)

227 P3d 729

John R. Kroger, Attorney General, Salem, argued the cause for respondent on review. With him on the briefs were Joanna L. Jenkins, Assistant Attorney General, and Jerome Lidz, Solicitor General.

Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for respondent on review.

Kevin L. Mannix, Sarah Hunt Vasche, Ross A. Day, and Tara Lawrence, Kevin L. Mannix, P. C., Salem, filed a brief on behalf of *amici curiae* Oregon Anti-Crime Alliance and Crime Victims United of Oregon.

Kevin M. Sali, Hoffman Angeli LLP, Portland, and John Henry Hingson III, John Henry Hingson III P.C., Oregon City, filed a brief on behalf of *amici curiae* ACLU Foundation of Oregon, Inc.

DE MUNIZ, C. J.

**DE MUNIZ, C. J.**

The state seeks review of a Court of Appeals decision that reversed and remanded defendant's DUII conviction. The Court of Appeals concluded that the trial court had erroneously admitted test results of defendant's blood alcohol content. The court reasoned that (1) defendant's consent to have his blood drawn and tested had been unlawfully coerced because he had been read the legal consequences for refusing to consent to those procedures as required by Oregon's implied consent statutes, ORS 813.095 to 813.136; and (2) the dissipation of alcohol from defendant's bloodstream over time did not, by itself, provide an alternative justification for a warrantless blood draw conducted to secure evidence of defendant's blood alcohol content. *State v. Machuca*, 231 Or App 232, 218 P3d 145 (2009). We allowed the state's petition for review, and, for the reasons that follow, we now reverse the Court of Appeals decision.

We take the facts from the Court of Appeals opinion and the record below:

"Defendant was involved in a single-car accident on Naito Parkway in Portland; he suffered injuries and was transported to the hospital emergency room facilities at Oregon Health and Science University (OHSU). Officer Oelke, the first officer on the scene, arrived at approximately 1:52 a.m. Officer Ladd arrived a few minutes later and took over the investigation. By 2:10 a.m., Ladd concluded that there was probable cause to believe that defendant had committed the crime of DUII. Ladd then went to OHSU to investigate further.

"After Ladd's arrival, hospital personnel allowed him to enter the emergency room facilities through a locked entry door, and he was directed by security staff to 'emergency room two.' Defendant was alone in the room, 'lying on a hospital bed receiving some care.' There was a very strong smell of alcohol in the room. Defendant, snoring loudly and in a deep sleep, was slow to wake. Ladd asked defendant several questions to evaluate his comprehension. Ladd explained why he was there and that defendant was under arrest for DUII and reckless driving. He gave defendant *Miranda* warnings and asked defendant questions from the standard DUII Interview Report form. Defendant responded to the questions slowly but directly. Ladd testified that defendant 'understood he'd bee[n] in a wreck,

knew where he was, he was in Portland at the hospital * * *. So he was fully aware of his situation, surroundings and why he was at the hospital.' Then Ladd read defendant his Driver and Motor Vehicle Services Division 'implied consent rights and consequences' and asked defendant if he would like to take a blood test. Defendant agreed to take the test, and Ladd summoned a nurse who administered the test, extracting defendant's blood at 3:18 a.m.

"Defendant was charged with reckless driving and DUII. He moved to suppress the evidence obtained by the officer at the hospital, arguing that it was obtained in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution."

*Machuca*, 231 Or App at 234-37 (footnotes omitted; brackets in original).

At the suppression hearing, the state argued that the warrantless taking of defendant's blood did not violate Article I, section 9, of the Oregon Constitution because (1) defendant had consented to the blood draw, and (2) the evanescent nature of blood alcohol evidence in the human body had created an exigency that, combined with probable cause to believe that defendant's blood contained evidence pertaining to the crime of DUII, was sufficient under Article I, section 9, to excuse any warrant requirement. As part of the state's case, the forensic scientist who had tested defendant's blood sample testified regarding the procedures used to ascertain the sample's alcohol content. Among other things, the scientist explained the concept of blood alcohol dissipation:

"The longer it is between when the person last consumed the alcohol and when the blood sample is drawn for analysis, the longer that time period is, the lower the blood alcohol content will be. So if there's an initial blood draw at the hospital for the hospital to do a testing—I mean, I don't know the facts of this case, but sometimes it's another hour or two later when they finally do the blood draw that is then going to come to the Crime Lab."

When asked how the dissipation rate was assessed for testing purposes, the scientist answered:

"Well, there's an average dissipation rate that we use in the lab to estimate the difference, and so, you know, it depends—it varies from person to person, but our average

dissipation rate that we use for calculations is .015 per hour. So that's how much lower the blood alcohol content would get per hour, .015 percent."

The trial court denied defendant's motion to suppress the blood alcohol evidence. In its written opinion, the trial court concluded:

"The state established its burden of proving, by a preponderance of the evidence, that the defendant's consent to have his blood drawn and analyzed was given voluntarily based on the totality of the circumstances. The state did not meet its burden, however, with respect to the second proffered exception to the warrant requirement, *i.e.*, the existence of probable cause and exigent circumstances. More specifically, the state failed to prove that the evidence it sought would have been sacrificed by the time it would take the officers to obtain a search warrant."

*Machuca*, 231 Or App at 237. Based on the trial court's ruling, defendant entered a conditional plea of guilty,[1] reserving the right to appeal the trial court's denial of his motion to suppress.

On appeal, defendant contended that the trial court had erred in refusing to suppress the results of the blood alcohol test.[2] Among other things, defendant claimed that he had agreed to the blood draw only after Officer Ladd had read him the required Department of Motor Vehicles (DMV) implied consent form setting out the consequences for refusing to consent to having his blood drawn.[3] Defendant argued

---

[1] ORS 135.335(3) provides:

"With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

[2] The blood sample that the hospital took for Officer Ladd revealed that, approximately an hour and a half after defendant's accident, his blood-alcohol content was .20. ORS 813.010(1)(a) provides:

"A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"(a) Has 0.08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under ORS 813.100, 813.140 or 813.150[.]"

[3] Under ORS 813.100(1), persons operating motor vehicles on Oregon highways are deemed to have implicitly given their consent to a chemical blood test to

that his decision to allow his blood to be taken and tested therefore was not a free exercise of his will and could not be viewed as a valid consent to a warrantless search and seizure for purposes of Article I, section 9.

In an en banc decision, a divided Court of Appeals agreed, citing this court's decision in *State v. Newton*, 291 Or 788, 636 P2d 393 (1981), *overruled in part on other grounds by State v. Spencer*, 305 Or 59, 750 P2d 147 (1988):

> "What is determinative in this context, however, is that the consent was procured through a threat of economic harm and loss of privileges. It was obtained only after defendant was given the warnings required by ORS 813.130(2) about the consequences of a refusal to allow a blood test. Under *State v. Newton*, a consent to search obtained in that fashion is coerced by the fear of adverse consequences and is ineffective to excuse the requirement to obtain a search warrant."

*Machuca*, 231 Or App at 240 (internal citation omitted). In reaching that conclusion, the majority relied on the following statement from *Newton*:

---

determine blood alcohol content if (1) they are receiving medical care in a health care facility immediately after a motor vehicle accident, and (2) they have been arrested for driving under the influence of an intoxicant. Before such a test is administered, however, ORS 813.100(1) also requires that a person requested to take the test be informed of the consequences of refusing to do so as set out in ORS 813.130. ORS 813.130(2) provides, in part:

"(a) Driving under the influence of intoxicants is a crime in Oregon, and the person is subject to criminal penalties if a test under ORS 813.100 shows that the person is under the influence of intoxicants. If the person refuses a test or fails, evidence of the refusal or failure may also be offered against the person.

"* * * * *

"(c) If the person refuses or fails a test under ORS 813.100, the person's driving privileges will be suspended. The outcome of a criminal charge for driving under the influence of intoxicants will not affect the suspension. The suspension will be substantially longer if the person refuses a test.

"(d) If the person refuses a test or fails a breath test under ORS 813.100 and has an Oregon driver license or permit, the license or permit will be taken immediately and, unless the person does not currently have full valid driving privileges, a temporary driving permit will be issued to the person.

"(e) If the person refuses a test under ORS 813.100, the person will not be eligible for a hardship permit for at least 90 days, and possibly for one year, depending on the person's driving record. The person may possibly qualify for a hardship permit in 30 days if the person fails a test, depending on the person's driving record."

"Where a person's consent to a seizure is solicited, and the person consents only after being warned that he will suffer a substantial penalty if he refuses, the resulting consent cannot be regarded as a free exercise of will. We therefore hold that defendant's submission to the breath test was not a voluntary consent to seizure because it was coerced."

291 Or at 801. According to the Court of Appeals' majority, that statement, when considered together with the "views expressed in the separate concurring and dissenting opinions [in that case]," announced the opinion of the court with respect to the Article I, section 9, analysis used in that case. *Machuca*, 231 Or App at 243 n 7. As a result, although the majority expressed some misgivings regarding the abstract correctness of *Newton*'s coercion statement, it nevertheless concluded that it was required to acknowledge and follow that holding:

"[W]e cannot turn a blind eye, as the dissent suggests, to a determination by a majority of the Supreme Court that is labeled as a holding by the court and is relevant to the outcome reached by that majority and that has not been distinguished, questioned, or implicitly overturned in subsequent opinions of that court."

*Id.* at 243.

After holding that defendant's consent to the blood draw had not been voluntary for purposes of Article I, section 9, the Court of Appeals' majority went on to examine whether exigent circumstances justified the blood draw as a constitutionally permissible warrantless search. Citing this court's decision in *State v. Moylett*, 313 Or 540, 548-49, 836 P2d 1329 (1992), the Court of Appeals' majority opined that, in order to draw defendant's blood without a warrant and not violate Article I, section 9, the state was required to prove that: (1) police authorities had probable cause to believe that defendant's blood contained relevant evidence that would be revealed once that blood was analyzed; (2) a warrant could not have been obtained without sacrificing that evidence; and (3) the extraction of defendant's blood was made promptly once defendant had been taken to a place where the extraction could be made. Noting that the state had failed to provide any evidence demonstrating that the arresting officer

could not have quickly obtained a warrant to draw and test defendant's blood, the majority held:

> "[t]he state was not relieved of its duty to obtain a warrant under Article I, section 9. The requirement to obtain a warrant is not excused by the mere fact that alcohol dissipates in the bloodstream over time."

*Machuca*, 231 Or App at 247. The Court of Appeals therefore concluded that the trial court erred in not suppressing the blood alcohol test results.

Four Court of Appeals judges dissented. The dissent opined that treating *Newton*'s statement respecting coercion as a binding precedent for purposes of interpreting the implied consent law was erroneous because: (1) that analysis was joined by only three members of this court; and (2) under settled Oregon law, an accurate statement regarding the lawful consequences that may occur if consent to a legal search is withheld is not coercive with respect to a defendant's decision to allow such a search to take place.[4] 231 Or App at 248-50 (Haselton, J., dissenting).

As noted, we allowed the state's petition for review and now examine the Court of Appeals' Article I, section 9, analysis regarding (1) the role that exigent circumstances play in blood draws conducted under scenarios like the one at issue here, and (2) defendant's participation in the blood draw obtained in this case.[5]

---

[4] In support of that proposition, the Court of Appeals' dissent cited, among other cases, this court's decision in *State v. Hirsch*, 267 Or 613, 518 P2d 649 (1974). *Machuca*, 231 Or App at 249-50 (Haselton, J., dissenting). In *Hirsch*, the defendant argued that his consent to a search was involuntary, because it was preceded by an officer's statement that the officer would get a search warrant if necessary. This court rejected the defendant's argument, relying on a statement in Chief Justice O'Connell's dissent in *State v. Douglas*, 260 Or 60, 81, 488 P2d 1366 (1971):

> " '* * * The officer's threat that he would obtain a warrant if defendant did not consent to the search did not constitute the kind of coercion that renders a search involuntary. Concededly such a threat may be coercive in the sense that an accused would not have consented to the search in the absence of the threat. But not all coercion inducing consent to a search is constitutionally impermissible. If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable.' "

*Hirsch*, 267 Or at 622.

[5] We decline, however, to take up defendant's request—presented as part of his response to the state's petition for review—that we also review an issue that the Court of Appeals decided against defendant; namely, whether police officers must

We begin with the Court of Appeals' exigent circumstances analysis, focusing, in particular, on the Court of Appeals' reliance on *Moylett* for the proposition that the state was required to prove that the arresting officer could not have obtained a warrant to draw defendant's blood without inevitably sacrificing evidence of defendant's blood alcohol content. The state argues that *Moylett*'s exigency analysis is, essentially, an anomaly—a holding that is at odds with the case on which it is based—*State v. Milligan*, 304 Or 659, 748 P2d 130 (1988)—and that *Moylett* has not been followed since it was announced. To determine the correctness of that assertion, we turn to this court's previous decisions regarding the evanescent nature of alcohol in the blood stream as an exigent circumstance justifying a warrantless seizure of a person's blood.

This court first recognized the "highly evanescent" nature of blood alcohol content over 30 years ago in *State v. Heintz*, 286 Or 239, 594 P2d 385 (1979). The defendant in *Heintz* was found guilty of second-degree manslaughter after the vehicle that he was driving left the road and crashed into a power pole, killing the passenger riding with him. The defendant's conviction was based, for the most part, on evidence that the defendant was intoxicated at the time of the accident, a determination that had turned primarily on evidence derived from warrantless blood draws and subsequent blood alcohol tests that police authorities had had medical personnel conduct after the defendant was taken to a hospital. On review, this court concluded that the warrantless blood draws did not violate Article I, section 9. Among the factors that the court cited in reaching that conclusion was the observation that—due to the tendency of alcohol to rapidly dissipate from the blood stream once alcohol consumption has stopped—the warrantless blood draws had been necessary to preserve that evidence. In that regard, the court stated:

"Finally, it is also clear that alcohol in blood after drinking is 'highly evanescent evidence' in that 'the percentage of

have either a warrant or consent before entering a criminal suspect's hospital room. *See* ORAP 9.20(2) (party's questions raised in response to petition for review are properly before the court, although the court need not address them).

alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system.' "

*Heintz*, 286 Or at 248 (quoting *Cupp v. Murphy*, 412 US 291, 296, 93 S Ct 2000, 36 L Ed 2d 900 (1973), and *Schmerber v. California*, 384 US 757, 770, 86 S Ct 1826, 16 L Ed 2d 908 (1966) (internal citations omitted)).

This court emphasized that same proposition nine years later in *State v. Milligan*, 304 Or 659, 748 P2d 130 (1988). Like *Heintz*, *Milligan* involved a defendant who, while intoxicated, crashed the car that he was driving, killing his passenger. The defendant was convicted of negligent homicide based, in part, on blood alcohol evidence obtained without a warrant after police officers had samples of the defendant's blood drawn at the hospital to which he was taken after the accident. In concluding that the search of the defendant's body and the seizure of his blood did not violate Article I, section 9, this court began with the observation that, at the time that the defendant was seized, the police had probable cause to believe that the blood alcohol evidence in his body was rapidly dissipating:

> "When he was seized, the officers had probable cause to believe that defendant was a vessel containing evidence of a crime he had committed—evidence that was dissipating with every breath he took. *See State v. Heintz, supra*, 286 Or at 248, 249."

*Milligan*, 304 Or at 665. Citing *State v. Matsen / Wilson*, 287 Or 581, 601 P2d 784 (1979), the court then observed:

> "Warrantless seizure and search under such circumstances therefore is constitutionally justified, unless a warrant can be obtained without sacrificing the evidence."

*Millligan*, 304 Or at 665-66 (citation omitted).

*Matsen / Wilson*, one of the principal decisions cited in *Milligan*, was a case in which police had, through a protracted period of surveillance, developed probable cause to search a residence that was being used for drug trafficking. Police officers had not yet obtained a search warrant when the individual they suspected of being the primary drug supplier for the operation unexpectedly arrived at the house. At

that point, police officers raided the house without a warrant. On review, the state argued that the warrantless incursion into the residence had been necessary to prevent a loss of evidence. This court disagreed, observing:

> "More specifically, the evidence does not support the trial court's finding of exigent circumstances *because the state failed to prove that destruction of contraband or the escape of the defendants was imminent.* The fact that drugs are usually of a destructible nature, and the fact that suspects are likely to run out the back door when police enter the front door[,] does not ipso facto create exigent circumstances."

*Matsen / Wilson*, 287 Or at 587 (emphasis added).

*Milligan*, however, differed from *Matsen / Wilson* in that the state had provided evidence underscoring exactly the type of exigency that had necessitated a warrantless blood draw from the defendant in that case. In *Milligan*, this court explained how testimony before the trial court had demonstrated the need to secure evidence of the defendant's blood alcohol content before it had dissipated:

> "In order to determine accurately the level of alcohol in a suspect's blood at the time of the alleged crime, the police must obtain an initial sample of the suspect's blood with as little delay as possible. Testimony at the hearing on defendant's motion to dismiss established that alcohol dissipation rates vary from person to person. To determine the dissipation rate of any particular individual, it is necessary to take more than one blood sample. A nurse at the hospital testified that the 'usual practice' was to draw the blood samples one hour apart. Thus, the first blood sample must be drawn early enough so that a measurable amount of alcohol will still be present in the suspect's blood an hour later. *This evidence established that exigent circumstances existed justifying the warrantless extraction of at least the initial blood sample,* so long as the extraction was made promptly after the suspect was taken to a place where it could be made. He was taken to such a place in this case. No warrant was required for the initial testing of defendant's blood."

*Milligan*, 304 Or at 666 (emphasis added). Later, in a footnote, the court reiterated that the testimony in *Milligan*

relating to blood alcohol dissipation had been sufficient to establish exigent circumstances in that case:

> "The trial court held that no exigent circumstances existed *vis-a-vis* the initial extraction of blood because no evidence showed the amount of time that would have been lost in obtaining a warrant. As we have already noted, this legal conclusion asks too much of the evidence. From the testimony the trial court accepted, exigent circumstances existed justifying the initial, warrantless extraction because alcohol was *dissipating at some significant rate.*"

*Id.* at 666 n 5 (emphasis in original).

*Milligan* became, in turn, the foundation for the court's subsequent decision in *Moylett,* albeit with a significant alteration. In *Moylett,* the defendant had rear-ended a stopped pickup truck. The defendant was hospitalized soon after the collision, but not before the investigating police officer had noted the odor of alcohol on the defendant's breath, along with other indicia of intoxication. Three blood samples were taken from the defendant while at the hospital, the first one drawn without a warrant. The trial court subsequently suppressed the evidence obtained from the warrantless sample. This court affirmed that ruling. In doing so, the court relied extensively on *Milligan*, citing that case for the proposition that

> "[i]n the context of an alcohol-related crime, there commonly will be an exigency because, as we already have noted, a suspect is 'a vessel containing evidence of a crime he had committed—evidence that [i]s dissipating with every breath he t[akes].' "

*Moylett*, 313 Or at 550 (quoting *Milligan*, 304 Or at 665 (brackets in original)). The court also acknowledged that, as in *Milligan*, there was evidence in the record before it that

> "[t]he loss of alcohol evidence which creates the exigency occurs because of the biological fact that the human body metabolizes and expels alcohol."

*Id.* The court nevertheless determined that, in addition to that evidence, *Milligan*'s exigency analysis also required the state to prove that a warrant could not have otherwise been expeditiously obtained:

"The exigency created by the dissipating evidence of blood alcohol, however, did not make the blood sample seizures *per se* reasonable under Article I, section 9. The state was still required to prove, in order to justify the warrantless extraction of defendant's blood, that it could not have obtained a search warrant 'without sacrificing the evidence' and that the blood sample that it obtained had been extracted 'promptly.' *State v. Milligan, supra*, 304 Or at 666."

*Moylett*, 313 Or at 550-51. Concluding that there was evidence in the record that police officers could have quickly obtained a warrant to test the first sample of the defendant's blood, the court affirmed the trial court order suppressing that evidence. *Id.* at 551.

■     After examining the cases set out above, we conclude that the exigent circumstances analysis set out in *Moylett*, which required the state to prove "that it could not have obtained a search warrant without sacrificing the evidence," unnecessarily deviated from this court's established case law. Until *Moylett*, the court's focus had been on the exigency created by blood alcohol dissipation. *Moylett*, however, shifted that focus away from the blood alcohol exigency itself and onto the speed with which a warrant presumably could have issued in a particular case. In our view, that shift was unsupported by the cases that preceded it, and we disavow it now.

*Milligan* was not, and is not now, to the contrary. We agree with the observation in Milligan that a "[w]arrantless seizure and search under such circumstances therefore is constitutionally justified, unless a warrant can be obtained without sacrificing the evidence." 304 Or at 665-66. *Milligan*, however, illustrates that when probable cause to arrest for a crime involving the blood alcohol content of the suspect is combined with the undisputed evanescent nature of alcohol in the blood, those facts are a sufficient basis to conclude that a warrant could not have been obtained without sacrificing that evidence.

■ ■     It may be true, phenomenologically, that, among such cases, there will be instances in which a warrant could have been both obtained and executed in a timely fashion. The mere possibility, however, that such situations may

occur from time to time does not justify ignoring the inescapable fact that, in every such case, evidence is disappearing and minutes count. We therefore declare that, for purposes of the Oregon Constitution, the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the kind taken here. We do so, however, understanding that particular facts may show, in the rare case, that a warrant could have been obtained and executed *significantly* faster than the actual process otherwise used under the circumstances. We anticipate that only in those rare cases will a warrantless blood draw be unconstitutional.

■       Applying the foregoing rule, this is not the rare case. Here, the state's evidence was sufficient to establish an exigency justifying the warrantless seizure of defendant's blood for constitutional purposes, and the Court of Appeals erred in concluding otherwise.

As noted earlier, the state argued before the trial court and the Court of Appeals that, in addition to probable cause/exigent circumstances, the warrantless blood draw also was permissible under Article I, section 9, because defendant had voluntarily consented to it. In rejecting that argument, the Court of Appeals' majority concluded that the plurality opinion in *State v. Newton*, 291 Or 788, established that advising a suspect of the "adverse legal consequences" for refusing to permit a blood draw is coercive as a matter of law, rendering a suspect's consent to a blood draw constitutionally involuntary. According to the Court of Appeals' majority:

> "[A] consent to search obtained in that fashion is coerced by the fear of adverse consequences and is ineffective to excuse the requirement to obtain a search warrant."

*Machuca*, 231 Or App at 240. The state challenges that ruling. However, because we have concluded that the state established exigent circumstances justifying the warrantless blood draw· under the Oregon Constitution, we need not determine whether defendant's consent was valid under Article I, section 9, nor do we need to determine whether the Court of Appeals correctly interpreted and relied on the plurality opinion in *Newton*.

■ Although the warrantless blood draw in this case did not violate Article I, section 9, the legislature has nevertheless expressed a policy preference against physically compelling blood draws or breath tests, by permitting a suspect to refuse the test. ORS 813.100(2) provides:

"No chemical test of the person's breath or blood shall be given, under subsection (1) of this section, to a person under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance, if the person refuses the request of a police officer to submit to the chemical test after the person has been informed of consequences and rights as described under ORS 813.130."

■ At the same time, however, the legislature has imposed penalties for refusing the test, mandating longer license suspensions for refusing a test than for failing it, and permitting a refusal to be used as evidence against the person in a civil or criminal court proceeding. ORS 813.130(2)(a); ORS 813.310. As this court stated in *State v. Spencer*, 305 Or 59, 71, 750 P2d 147 (1988):

"[T]he statute's references to a driver's 'refusal' do not evince a legislative concern that the driver make a voluntary and fully informed decision whether to submit to the test. Consent being implied by law, a driver may not legally refuse. A driver, however, can *physically* refuse to submit, and the implied consent law, recognizing that practical reality, forbids the use of physical force to compel submission."

(Emphasis in original.) Thus, the legislative policy embodied in the implied consent law was " 'designed to overcome the possibility of physical resistance, despite legal consent, without resort to physical compulsion' by imposing adverse legal consequences on a refusal to submit to the test." *Id.* at 67 (quoting *Newton*, 291 Or at 793).

Here, defendant had been validly arrested for DUII and was accurately informed of his rights and the prescribed consequences that would flow from a refusal to consent to the blood draw. To the extent that defendant's decision to permit the blood draw was influenced, even significantly, by the

statutory advice of rights and adverse consequences of refusing the blood draw, the implied consent law operated exactly as the legislature intended.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.