Argued and submitted November 25, 2013, reversed and remanded
August 20, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

PAUL VERNON SULLIVAN,
*Defendant-Appellant.*

Beaverton Municipal Court
M8060071, UC7588121;
A150021 (Control), A150023

333 P3d 1201

Kali Montague, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. With her on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

## EGAN, J.

The question in this case is whether, under either Article I, section 9, of the Oregon Constitution, or the Fourth Amendment to the United States Constitution, it was lawful for a police officer to kick in the door of defendant's residence and arrest him without a warrant after the officer developed probable cause to believe that defendant had driven his car while intoxicated. The trial court concluded that the warrantless entry was lawful on the ground that immediate police action was necessary to protect defendant's young son from a threat of harm. In this appeal by defendant challenging his resulting conviction for driving under the influence of intoxicants (DUII), ORS 813.010, and one count of recklessly endangering another person, ORS 163.195, the state mounts only a token effort to argue that the trial court's conclusion on that point was correct. Instead, it identifies a different "exigent circumstance" that justified the warrantless entry—that evidence of defendant's intoxication was dissipating. Relying on *State v. Machuca*, 347 Or 644, 227 P3d 729 (2010), the state contends that, contrary to the trial court's reasoning, the state was not required to prove that there was insufficient time for the officer to obtain a warrant as a necessary part of discharging its burden to justify the warrantless entry. We reject both the legal reasoning relied upon by the trial court and that underlying the state's proffered alternative basis for affirmance. Accordingly, we reverse and remand.

The facts are undisputed. Defendant was at the grocery store with a young boy, later determined to be his then-seven-year-old son. A store clerk perceived that defendant was drunk. He followed defendant out to the parking lot, where he observed defendant and his son get into a car and drive away. The clerk took note of the license plate number and passed that information along to police, who determined defendant's home address, which was at an apartment complex. Officer Burke arrived at the complex and observed a parked car with the license plate that he sought. After Burke got out of his car, he heard a male voice "yelling in slurred fashion." The officer turned and saw a man, defendant, standing on a flight of stairs; defendant matched the description of the suspect that Burke

had received. Defendant was with his son, who Burke perceived to be "pretty young," perhaps seven years old. Burke assumed that defendant's yelling was directed at the child. Burke ran to the base of the stairs and looked up at defendant. Burke, who was in uniform and displaying a badge, yelled "stop." Defendant looked down but did not stop. Instead, he "urged or pushed" his son up the stairs and into an apartment and slammed the door shut. Burke then observed defendant and his son closing the blinds and turning the lights off.

Burke arrived at the door almost simultaneously with two other officers. He pounded on the door and demanded that defendant come out. There was no response. Around that point, Burke learned from dispatch that defendant had a concealed weapons permit. He got in radio contact with his sergeant and announced his intention to break down the door; the sergeant agreed with that course of action. Burke testified that, at that point, his uppermost concern was the safety of the child. Burke took a few seconds to brief his fellow officers about the tactics that they would employ in entering the apartment; he then kicked the door in and called for defendant to come out. Hearing no response, the officers entered with their guns drawn. Defendant came forward and was arrested. At some later point, defendant refused Burke's requests that he submit to tests to detect alcohol in his system.[1]

As noted, defendant was charged with one count of DUII and one count of recklessly endangering another person, based on his having driven with his son in the car while under the influence. He filed a pretrial motion in which he sought to suppress all evidence derived from the entry of his home, claiming that the evidence was the product of unconstitutional police action under both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The court held a hearing on that motion, at which the state argued that certain exigent circumstances justified the warrantless entry. The exigencies cited by the state were a threat of harm to the child,

---

[1] Specifically, Burke stated that he did not seize defendant's blood and that defendant "refused the BAC."

the need to prevent the destruction of evidence of defendant's intoxication, and the fact that the police were in "hot pursuit" of defendant at the time that he retreated into his apartment.

At the hearing, Burke was questioned about whether he could have obtained, over the phone, a warrant that would have granted him the authority to enter the apartment before he kicked in the door. On that point, the trial court found as follows:

"Officer Burke at hearing testified on cross-examination that telephone warrants are not available in Washington County and that the Beaverton Municipal Court does not issue search warrants. The officer did not attempt to get a warrant by telephone in this case, nor has he at any other time. The officer testified he knows because of his training and experience as a Beaverton officer that telephone warrants are not given in his jurisdiction. That evidence is uncontroverted."

The court then turned to its legal conclusions regarding the exigent circumstances identified by the state as those that justified the warrantless entry. The court first concluded that the potential loss of the evidence of defendant's intoxication could not support the warrantless entry, stating:

"*When a warrantless search is challenged* * * * *the State must prove that a warrant could not be obtained in time to prevent the loss of evidence of intoxication.* In this case the defendant is charged with DUII and Officer Burke has testified that he could not obtain a warrant by telephone because such things do not exist in this jurisdiction. There is no evidence what-so-ever as to whether a warrant could have been obtained by traditional in-person methods. A warrantless search cannot be made on the basis of exigency unless it is shown that it was not practical under the totality of circumstances to obtain a warrant. There is a failure of proof here. There is no evidence that a warrant could not have been swiftly obtained by the traditional approach of an officer to a judge. In the absence of this proof the warrantless entry and search of defendant's apartment on a loss of evidence basis cannot be justified."

(Emphasis added.)

After next concluding that the entry could not be justified as necessary to prevent defendant's escape—a conclusion that is not challenged in this appeal—the court turned to examine whether the entry could be justified on the ground that Burke gave as his reason for making it, *viz.*, the need to prevent harm to the child. The trial court agreed that the need to prevent such harm justified, as a constitutional matter, the warrantless entry, stating: "An intoxicated adult in charge of a 7 year old child is[,] perhaps *per se*, a hazard to the child. An intoxicated adult who includes a powerless child in an unfolding episode of aggressive defiance of the police is most certainly a hazard to a child." On that basis, the trial court denied defendant's motion to suppress. He was later convicted of the charged crimes. This timely appeal followed.

Defendant's sole assignment of error is that the trial court erred in denying his motion to suppress. We review the trial court's legal determination for errors of law. *State v. Hampton*, 247 Or App 147, 149, 268 P3d 711 (2011), *rev den*, 352 Or 107 (2012). As he did below, defendant cites both Article I, section 9, and the Fourth Amendment as the grounds for suppression. In his opening brief, defendant contends that the state failed to prove that the circumstances known to Burke at the time he kicked in the door presented an emergency concerning the child's safety that would justify a warrantless entry. In response, the state makes only a perfunctory effort to argue that the trial court reached the correct legal conclusion on that point, and, in fact, argues that we do not need to reach that question at all. Instead, the state's main effort is to argue that the trial court was correct for a different reason: that under *Machuca*, 347 Or at 644, the ongoing dissipation of evidence of defendant's intoxication justified the warrantless entry and arrest.[2] We

___

[2] After the parties submitted their opening briefs in this case, the United States Supreme Court issued its decision in *Missouri v. McNeely*, ___ US ___, 133 S Ct 1552, 185 L Ed 2d 696 (2013), holding that, under the Fourth Amendment, dissipation of alcohol from a suspect's blood does not, *per se*, present an exigency that justifies a warrantless blood test in a drunk-driving case. After that decision issued, the state moved us for leave to file a supplemental brief "[i]n order to address significant developments in Fourth Amendment case law that occurred after the state filed its brief in this case." After we granted that motion, the state filed a supplemental brief that, in addition to addressing the ramifications of *McNeely*, attempted to revive—for the first time on appeal—its argument from

shall address the issues presented under Article I, section 9, before turning, if necessary, to address those presented under the Fourth Amendment. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (courts address state constitutional issues before those under the federal constitution).

Article I, section 9, provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search[.]" "Warrantless entries and searches of premises are *per se* unreasonable unless they fall within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). One such exception applies when police have probable cause to arrest a suspect and there are "exigent circumstances." *State v. Kruse*, 220 Or App 38, 42, 184 P3d 1182 (2008); *see also Bridewell*, 306 Or at 236 ("Securing a warrant before entry is unnecessary if exigent circumstances, in addition to probable cause, exist, *i.e.*, if an 'emergency' exists."). "An exigent circumstance is a situation that requires the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). "The state has the burden of proving that circumstances existing at the time were sufficient to satisfy any exception to the warrant requirement." *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011).

Two initial points will help to narrow the discussion. First, defendant concedes that Burke had probable cause to arrest him at the time that he fled into the apartment. Second, defendant does not mount any separate challenge to the legality of his arrest. Rather, the relevant question in this appeal is whether the circumstances described above created, for one reason or another, an exigency sufficient to excuse the lack of a warrant sanctioning the home entry.

---

below that the warrantless entry of defendant's home in this case could be justified under the doctrine of "hot pursuit." Consistently with the scope of its request to submit extra briefing, the state identified the Fourth Amendment and Fourth Amendment cases as the alternative basis for affirmance under the hot-pursuit doctrine. Because we conclude that the state failed to prove that the warrantless entry was lawful under Article I, section 9, we need not and do not address the state's Fourth Amendment hot-pursuit argument.

We begin with the ground that the trial court relied on, *viz.*, that there was a threat to the child's safety. The Oregon Supreme Court has recognized both an emergency/exigent circumstances exception to the warrant requirement and a distinct "emergency aid" doctrine. *See Bridewell*, 306 Or at 236-37 (so explaining). "The emergency aid doctrine is distinct from the emergency/exigent circumstances exception to the warrant requirement because the former does not require probable cause to believe that a crime has been committed." *Id.* at 236. Thus, although the state does not attempt to justify the home entry under the emergency-aid doctrine, the requirements of that doctrine inform the sorts of circumstances that will justify a warrantless home entry. In that context, the rule is well established:

> "[A]n emergency aid exception to the Article I, section 9, warrant requirement is justified when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm."

*Baker*, 350 Or at 649 (footnotes omitted).

There being no evidence that defendant's son was suffering, or had suffered, serious physical injury or harm, the question reduces to whether it was objectively reasonable for Burke to believe that the child was threatened with suffering serious physical injury or harm once inside the apartment with defendant. As found by the trial court, the circumstances known to Burke were that defendant had refused to obey Burke's order to stop; that defendant had yelled something at the child in a slurred voice; that defendant had fled after a police command to stop; that defendant had a concealed weapons permit; that defendant had "urged or pushed" the child up the stairs and into the apartment;[3] and that defendant had slammed the door and locked himself in his apartment with the child, and had immediately undertaken to conceal himself and the child from view. Additionally, there was probable cause to find that defendant had driven while intoxicated with the child in the car.

---

[3] There is no suggestion from either party that defendant's act of "urging or pushing" the child was anything other than an attempt to hurry the child along.

We conclude that those circumstances form an insufficient basis upon which to form an objectively reasonable conclusion that there was a risk of *imminent* harm to the child at the moment that Burke kicked the door in. There was nothing to suggest that defendant intended to harm his child or that he was otherwise disposed to commit violence. Nor were there any "articulable facts" that tended to narrow the conceivable array of human conduct that defendant *might* have been engaging in at that point, aside from, perhaps, the minimally informative fact that he and his son had turned off the lights and shut the blinds after entering the apartment. In addition, there was no evidence indicating that defendant was about to engage in reckless conduct *vis-à-vis* his son inside the apartment. In short, whatever threat of harm defendant posed to his son once inside the apartment was entirely a matter of speculation. *Cf. State v. Weaver*, 214 Or App 633, 639, 168 P3d 273, *rev den*, 343 Or 691 (2007) (outlining facts that provided an officer with reasonable grounds to believe that the children inside a residence were in immediate danger). We thus reject the trial court's conclusion that a threat of imminent harm to defendant's son constituted an exigent circumstance that excused Burke from obtaining a warrant before entering.

We next examine whether the potential for the destruction of evidence constituted an exigency sufficient to excuse the need for a warrant.[4] *See State v. Meharry*, 342 Or 173, 177, 149 P3d 1155 (2006) ("Exigent circumstances include, among other things, situations in which immediate action is necessary to prevent the disappearance, dissipation, or destruction of evidence."). The parties' arguments in this context center on the trial court's conclusion that there was a "failure of proof" regarding the state's destruction-of-evidence argument, *viz.*, that there was no evidence from

---

[4] The state's argument that the dissipation of evidence of defendant's intoxication constituted exigent circumstances is an argument that we should affirm the trial court on the ground that it was right for the wrong reason when it denied the motion to suppress. In reviewing the trial court's ruling, we "will affirm that ruling on appeal, even if the trial court's legal reasoning for the ruling was erroneous, if another legally correct reason and, to the extent necessary, the record developed in the trial court support the ruling." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (stating requirements for application of the "right for the wrong reason" doctrine).

the state that Burke could not have "swiftly obtained" a warrant through "the traditional approach of an officer to a judge." The state urges that the trial court's reasoning is not valid in light of the Oregon Supreme Court's decision in *Machuca*. The state contends that *Machuca* eliminated any need for it to show that a warrant could not have been obtained as part of discharging its burden to show that the warrantless entry was lawful. *See State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) ("The state has the burden of showing that circumstances existing at the time of entry invoke one of" "the specifically established and well-delineated exceptions to the warrant requirement." (Internal quotation marks omitted.)). Defendant, in turn, points to our decisions in *State v. Roberts*, 75 Or App 292, 706 P2d 564 (1985), and *Kruse*, 220 Or App at 38, for the proposition that the trial court's reasoning remains valid and that we should uphold it.

*Roberts* and *Kruse* predate *Machuca*; both concern whether it was permissible for police to conduct a warrantless entry of a home for the purpose of arresting a DUII suspect. In *Roberts*, police received a report of a drunk driver in a brown Pinto. They found a vehicle matching that description. 75 Or App at 294. After searching the vehicle, and speaking with witnesses, the police developed probable cause to believe both that the defendant had driven under the influence of intoxicants and that he was at an address on Franklin Street. *Id.* at 295.

> "The deputies arrived at the Franklin Street address * * *. They knocked on the door and rang the door bell with no response. The police dispatcher called [the] defendant's phone number. The deputies heard the phone ring, and then it stopped ringing. The dispatcher verified that the phone had been picked up and immediately hung up. The deputies consulted with their sergeant, who advised them to enter the home to check on [the] defendant's condition. They entered the unlocked apartment and announced their presence. They went upstairs to the bedroom and found [the] defendant in bed."

*Id.* at 294. The defendant moved to suppress evidence of his intoxicated state on the theory that the warrantless entry of his residence was invalid. The state sought to uphold the

entry on the ground that it was necessary to alleviate concern over the defendant's health and to prevent the dissipation of alcohol from the defendant's blood. We concluded that, under Article I, section 9, the trial court had erred by denying the motion to suppress. We reasoned:

> "Because of the peculiar nature of the DUII offense, [the] defendant's personal condition and, therefore, his person are evidence. In some circumstances, the need to secure that evidence of the crime of DUII—[the] defendant's body—might justify a warrantless entry of a home, *if the state proves that the arresting officers could not have obtained a warrant before the alcohol in the suspect's body dissipated.*"

*Id.* at 296 (emphasis in original).[5] We then concluded that the state had failed to meet its burden of proving that an exigency existed:

> "The officers did not seek a warrant. They offered no credible evidence of the length of time necessary to obtain a warrant. Without any evidence of that time or any evidence concerning the time required to secure the evidence, we will not assume that the officers could not have obtained a warrant within a reasonable time. [*State v. Rubert*, 46 Or App 843, 612 P2d 771 (1980)]."

*Roberts*, 75 Or App at 297.

We hewed to that holding in *Kruse*, where police responded to a report of a driver who had almost hit a person and was driving on a flat tire. 220 Or App at 40. Police arrived, observed a parked car matching the description of the one that they sought, a broken fence, and skid marks leading to the car. Defendant's 16-year-old daughter approached the officers while they were examining the car and told them that it belonged to her mother, the defendant. The daughter gave the officers permission to follow her into the nearby apartment where she lived with the defendant. The officers entered the apartment and remained in the entryway while the daughter went upstairs to speak with the defendant. From the entryway,

---

[5] We did not offer any discussion about the source of the requirement that the state must show that the officers could not have obtained a warrant before the alcohol in the suspect's blood dissipated.

one of the officers heard the defendant say to her daughter that she did not want to speak with the officers. One officer then climbed the stairs and talked with the defendant; he observed signs of intoxication and heard the defendant admit to being drunk.

After the state brought criminal charges, the defendant moved to suppress the evidence that had been discovered after the officer proceeded beyond the entryway. The officer testified that he did not know how long it would have taken to get a warrant, but that it would have been a "very lengthy" time. The state argued that the dissipation of the alcohol in the defendant's blood was an exigent circumstance. Relying on *Roberts*, we rejected that contention, stating, "The state's only evidence concerning the time necessary to obtain a warrant was that it would have been 'very lengthy,' although the officer did not know the 'exact time.' Consequently, the state failed to meet its burden to prove that exigent circumstances existed, and the evidence should have been suppressed." *Id.* at 43.

The state here contends that the determinative principle of those cases—that the state must show that the police could not have obtained a warrant within a "reasonable time" to justify a warrantless home entry under a destruction-of-intoxication evidence rationale—is no longer valid after the Supreme Court's decision in *Machuca*. In that case, a defendant was involved in a car accident and taken to an emergency room in the hospital. 347 Or at 646. A police officer responded. There was a very strong smell of alcohol in the room. The defendant was asleep. The officer woke him, arrested him, and read to him an "implied consent rights and consequences" form and asked defendant if he would "like to" take a blood test. *Id.* at 647. The defendant agreed to take the test, and the officer summoned a nurse who extracted the defendant's blood.

Before his DUII trial, the defendant moved to suppress the results of the blood testing under Article I, section 9. The Oregon Supreme Court upheld the trial court's denial of that motion. As relevant here, the state's argument was that the dissipating amount of alcohol in the defendant's blood constituted an exigency that, when coupled

with the officer's probable cause to think that the defendant had driven while intoxicated, was sufficient to excuse the need for a warrant. The court undertook a review of cases in which it had upheld warrantless blood draws for the purpose of investigating DUIIs. From *State v. Heintz*, 286 Or 239, 248, 594 P2d 385 (1979), the court took the proposition that "alcohol in blood after drinking is highly evanescent evidence in that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Machuca*, 347 Or at 652-53 (internal quotation marks omitted). The court also discussed *State v. Milligan*, 304 Or 659, 748 P2d 130 (1988), a case involving a warrantless blood draw from a defendant who was in the hospital following an accident. There, the court said, "Warrantless seizure and search under such circumstances * * * is constitutionally justified, unless a warrant can be obtained without sacrificing the evidence." *Id.* at 665-66 (citation omitted). The *Milligan* court had focused on the fact that testimony before the trial court had established that the alcohol in the defendant's system was "dissipating *at some significant rate.*" *Id.* at 666 n 5 (emphasis in original).

The *Machuca* court also discussed *State v. Moylett*, 313 Or 540, 836 P2d 1329 (1992). As in *Milligan* and *Heintz*, there was evidence in the record that "[t]he loss of alcohol evidence which creates the exigency occurs because of the biological fact that the human body metabolizes and expels alcohol." *Moylett*, 313 Or at 550. Unlike *Heintz* and *Milligan*, however, *Moylett* held that the mere fact that alcohol was dissipating was not enough for the state to show an exigency. Instead, the *Moylett* court concluded that the state was additionally required "to prove that a warrant could not have otherwise been expeditiously obtained" to justify the warrantless extraction. *Machuca*, 347 Or at 655-56. Specifically, the *Moylett* court stated:

> "The exigency created by the dissipating evidence of blood alcohol, however, did not make the blood sample seizures *per se* reasonable under Article I, section 9. The state was still required to prove, in order to justify the warrantless extraction of defendant's blood, that it could not have obtained a search warrant 'without sacrificing the

evidence' and that the blood sample that it obtained had been extracted 'promptly.' [*Milligan*, 304 Or at 666]."

*Moylett*, 313 Or at 550-51.

The *Machuca* court expressly disavowed that language from *Moylett*:

"After examining the cases set out above, we conclude that the exigent circumstances analysis set out in *Moylett*, which required the state to prove 'that it could not have obtained a search warrant without sacrificing the evidence,' unnecessarily deviated from this court's established case law. Until *Moylett*, the court's focus had been on the exigency created by blood alcohol dissipation. *Moylett*, however, shifted that focus away from the blood alcohol exigency itself and onto the speed with which a warrant presumably could have issued in a particular case. In our view, that shift was unsupported by the cases that preceded it, and we disavow it now.

"*Milligan* was not, and is not now, to the contrary. We agree with the observation in *Milligan* that a '[w]arrantless seizure and search under such circumstances therefore is constitutionally justified, unless a warrant can be obtained without sacrificing the evidence.' 304 Or at 665-66. *Milligan*, however, illustrates that when probable cause to arrest for a crime involving the blood alcohol content of the suspect is combined with the undisputed evanescent nature of alcohol in the blood, *those facts are a sufficient basis to conclude that a warrant could not have been obtained without sacrificing that evidence.*"

*Machuca*, 347 Or at 656 (emphasis added) (brackets in *Machuca*). With that treatment of the case law, the court went on to announce the following rule in the warrantless blood-draw context:

"It may be true, phenomenologically, that, among such cases, there will be instances in which a warrant could have been both obtained and executed in a timely fashion. The mere possibility, however, that such situations may occur from time to time does not justify ignoring the inescapable fact that, in every such case, evidence is disappearing and minutes count. We therefore declare that, for purposes of the Oregon Constitution, the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the

kind taken here. We do so, however, understanding that particular facts may show, in the rare case, that a warrant could have been obtained and executed *significantly* faster than the actual process otherwise used under the circumstances. We anticipate that only in those rare cases will a warrantless blood draw be unconstitutional."

*Id.* at 656-57 (emphasis in original).

Returning to the present case, the trial court's finding that the state presented no evidence about whether Burke could have "swiftly obtained" a warrant by traditional means goes unchallenged; thus, the dispositive question is whether *Machuca* operates in this context to relieve the state from any need to show that Burke could not have obtained a warrant without sacrificing the evidence. The state urges that *Machuca* displaces our precedents in *Roberts* and *Kruse* and identifies three ways in which evidence of the crimes being investigated was—or was potentially—being lost during the time that defendant remained concealed in his apartment: First, the level of alcohol in defendant's blood (his BAC) was dissipating with time; second, the police were deprived of the opportunity to observe defendant for physical manifestations of intoxication, such as decreased balance; third, defendant could, while obscured from police view, consume alcohol (or, at least, claim that he did so), thus allowing him to later argue that he became intoxicated only upon arriving home.

Defendant contends that *Machuca* does not control here for several reasons. First, he points out that *Machuca* was decided in the narrow context where the police have already lawfully seized a person and are seeking to justify a very specific type of additional intrusion. Defendant urges that a home entry involves a greater invasion of individual privacy than a blood draw, insofar as the blood draw is designed to seek out a very specific sort of information (the level of alcohol in a person's blood), whereas a home entry may reveal a panoply of information about a person's private affairs. He also contends that the existence of the implied-consent statutory scheme, under which the police may not physically compel a person to submit to a blood draw or a breath test, means that a warrantless home entry is not guaranteed to lead to discoverable evidence—*i.e.*, even if

seized, the suspect may refuse to submit to the sought-after BAC testing.[6]

We conclude that *Machuca* does not control in the present circumstances. First, *Machuca* does not, by its terms, address the question of a warrantless home entry for the purpose of making an arrest. The state would read the sentence "the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will *ordinarily permit a warrantless blood draw of the kind taken here*," 347 Or at 657 (emphasis added), as equivalent to a statement that "the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will *ordinarily permit a warrantless home entry for the purpose of arresting defendant*." The facts are, however, that *Machuca* was explicitly decided in the warrantless blood-draw context and that it was also the last in a line of Oregon search-and-seizure cases to address a recurring and very particular dynamic: a blood draw taken from a suspect who had been seized and was at the hospital at the time that the blood draw was sought.[7]

It is, of course, still possible, as the state suggests, that *Machuca* stands for a principle about the nature of intoxication evidence *qua* exigent circumstance that applies beyond the relatively narrow context in which the case was decided. The situations in which we have applied *Machuca*, however, track closely to those in *Machuca* itself: *viz.*, a suspect who is in police custody and a government intrusion that is specifically tailored to detect intoxication evidence. In *State v. McMullen*, 250 Or App 208, 279 P3d 367 (2012), *rev den*, 355 Or 380 (2014), the defendant was arrested for DUII and taken to the police station. After a state trooper read to her from an "'informed consent'" form, the defendant declined the invitation to speak with a lawyer, and agreed to

---

[6] *See* ORS 813.100(2) ("No chemical test of the person's breath or blood shall be given * * * to a person under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance, if the person refuses the request of a police officer to submit to the chemical test after the person has been informed of consequences and rights as described under ORS 813.130.").

[7] In contrast to the other three cases, *Moylett* did not explicitly state that the defendant had been seized; nonetheless, the defendant had been transported by a sheriff from the scene of an accident to the hospital, and had his blood drawn over his objection. 313 Or at 542-43.

submit to a breath test. *Id.* at 209. The test revealed no alcohol in the defendant's bloodstream. The trooper believed that the defendant was under the influence of a different intoxicant and decided to obtain a urine sample for the purpose of detecting such. He then read to her a different portion of the implied consent form, informing her of the statutory consequences of declining the test. After making a telephone call, the defendant agreed, some two hours after her arrest, to provide the urine sample. She later sought to suppress the results of that test. The trial court ordered the testing results suppressed, stating that no exigency existed because the police could have obtained a warrant in the time that it would have taken for any controlled substances to entirely dissipate from the defendant's urine. We reversed, citing *Machuca*: "Except in 'rare cases'—and there is nothing in the record to indicate that this is one—the state needed to establish only the 'evanescent nature' of a controlled substance in [the] defendant's urine." *McMullen*, 250 Or App at 213 (citing *Machuca*, 347 Or at 657). *Accord State v. Fuller*, 252 Or App 245, 254, 287 P3d 1147 (2012) (stating, in a case where a defendant who had been arrested for DUII submitted to a urine test designed to detect drug use, that "[i]t is sufficient that the officers had probable cause to believe that evidence of a controlled substance would be found in defendant's urine and that evidence was adduced at the suppression hearing establishing that certain controlled substances are of an 'evanescent nature'"); *State v. Hays*, 234 Or App 713, 228 P3d 731 (2010), *rev den*, 349 Or 480 (2013) (under *Machuca*, exigent circumstances justified administering a breath test to a defendant who had been arrested, taken to the sheriff's office, and informed of his implied-consent rights).

In *State v. Mazzola*, 260 Or App 378, 317 P3d 360 (2013), *rev allowed*, 355 Or 380 (2014), an officer stopped the defendant for two traffic violations and, in the course of the stop, observed signs of intoxication. He asked the defendant if she would agree to perform certain field sobriety tests (FSTs); the defendant agreed and, after performing them, was arrested for controlled-substance DUII. She moved to suppress the results of certain of the FSTs. On appeal, the issue was whether exigent circumstances

justified those warrantless searches. *See State v. Nagel*, 320 Or 24, 30-31, 880 P2d 451 (1994) (FSTs are searches). Although the state had not presented any evidence about how long it would have taken for the officer to obtain a warrant, we stated:

> "In *Machuca*, the Supreme Court observed that, as a general matter, 'the undisputed evanescent nature of alcohol in the blood' provides 'a sufficient basis to conclude that a warrant could not have been obtained without sacrificing that evidence.' 347 Or at 656 * * *. We see no reason why that rule would not also apply to cases, like this one, involving FSTs, *which are designed to enable officers to detect current impairment.*"

*Mazzola*, 260 Or App at 382-83 (quoting *Machuca*, 347 Or at 656) (emphasis added; footnote omitted).

As the foregoing cases show, the circumstances in which we have applied *Machuca* are factually close to those that existed in *Machuca* and each of its direct predecessors, *Heintz, Moylett,* and *Milligan*. That is, we have read *Machuca* to apply in the context of limited testing that is specifically designed to detect impairment, performed on a defendant who has already been validly seized as a prelude to that testing.

Here, we are confronted with a fundamentally different type of government intrusion, a home entry. As the Oregon Supreme Court has recently observed,

> "[t]he degree to which law enforcement conduct intrudes on a citizen's protected interest in privacy and liberty is significantly affected by where the conduct occurs, such as in the home, in an automobile, or on a public street. *A government intrusion into the home is at the extreme end of the spectrum: Nothing is as personal or private. Nothing is more inviolate.*"

*State v. Fair*, 353 Or 588, 600, 302 P3d 417 (2013) (internal quotation marks omitted) (emphasis added); *see id.* at 601 ("Here * * * the officers' orders to defendant to come out of her home and then remain where she was on the porch * * * ran headlong into *the added limits on police authority that apply to a citizen in the privacy of her home.*" (Emphasis added.)); *accord Payton v. New York*, 445 US 573, 585, 100

S Ct 1371, 63 L Ed 2d 639 (1980) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (Internal quotation marks omitted.)). By way of contrast, in *Heintz*, one of the cases relied on by the court in *Machuca*, the court stated:

> "[T]he 'intrusion' that took place under the facts and circumstances of this case to preserve the evidence was a limited one. As stated by the Supreme Court of the United States in *Schmerber v. California*, [384 US 757, 771, 86 S Ct 1826, 1836, 16 L Ed 2d 908 (1966)], in approving the taking of a blood sample 'in a hospital environment' as a 'minor intrusion * * * under stringently limited conditions,' as in this case:
>
>> "'* * * Such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain. * * *'"

286 Or at 248 (omissions in *Heintz*).

Taking those precedents at their word—that nothing is more inviolate than the home, and that a warrantless blood draw taken from an already-seized suspect in a hospital is a "limited intrusion"—*Machuca* concerned a government intrusion of a lesser magnitude than the home entry at issue here. *See Fair*, 353 Or at 603 ("Article I, section 9, typically requires a degree of justification for a seizure of a person that correlates with the extent to which police conduct intrudes on that citizen's liberty.").

In the warrantless home-entry context, as distinct from the intoxication-testing context, the appellate case law has consistently reflected the substantial burden that the state faces when it attempts to justify a warrantless home entry. The principle at the heart of the exigent-circumstances exception to the warrant requirement is the notion that there are instances in which the time and effort that police would have to expend to procure a warrant would thwart whatever purpose the search or seizure in question was intended to accomplish. *See Stevens*, 311 Or at 126 ("An exigent circumstance is a situation that requires the police to act swiftly * * *."). That is why, in the related emergency-aid

context, for instance, police are justified in making a warrantless entry of the home when that entry is "necessary to either render *immediate* aid to persons, or to assist persons who have suffered, or who are *imminently threatened* with suffering, serious physical injury or harm." *Baker*, 350 Or at 649 (footnotes omitted) (emphasis added); *see Davis*, 295 Or at 243 ("Absent articulable facts that evidence a *compelling and urgent* need for the [motel room] entry, the Oregon Constitution demands a warrant be issued."); *State v. Burdick*, 209 Or App 575, 581, 149 P3d 190 (2006) ("[W]hether an emergency exists depends on whether *immediate action is required*." (Emphasis added.)). Likewise, when the claimed exigency is the need to prevent a suspect's escape or to prevent the destruction of evidence, warrantless entry is permissible only when the escape or destruction "was *imminent*." *State v. Matsen/Wilson*, 287 Or 581, 587, 601 P2d 784 (1979) (emphasis added).

In some cases, it is easy to identify the circumstance that creates the demand for immediate police action: drugs may be flushed down the toilet or a forged document may be burned in a relative instant. That is not so where a suspect's intoxication is the potential evidence sought; depending on the time that the warrant would have taken to obtain, the alcohol in the bloodstream might have dissipated entirely, not at all, to a degree that impaired the efficacy of testing, or to a degree that had no material effect. Given that range of possibilities, the one thing that is certain is that a *sine qua non* to determining the necessity of an *immediate* home entry is some showing as to how long it would have taken to obtain a warrant under the circumstances.[8] Without requiring the state to make any showing on that point as part of its burden to justify a warrantless home entry, it is impossible to say to what degree—if any at all—that the potential evidence sought would have been "sacrificed." *Machuca*, of course, eliminates any need to undertake that analysis in an "ordinar[y]" blood-draw case, but, as we have shown,

---

[8] Burke never expressed a belief that he needed to kick down the door in order to obtain the BAC evidence quickly; to the contrary, he stated that his motivation in kicking down the door was to protect the child. Neither party ascribes significance to the officer's subjective motivations for kicking in the door, and we therefore assume, but do not decide, that those subjective motivations are not relevant to the analysis.

that case addresses a fundamentally different sort of intrusion than the one at issue here.

Put simply, the home is different. Because of the magnitude of the privacy interest involved, it is appropriate in this context to demand that the state make at least some showing of the feasibility of obtaining a warrant. In fact, we have "specifically established" that the state was required to make that showing. *Roberts*, 75 Or App at 296; *Kruse*, 220 Or App at 43. In view of those cases, in the absence of controlling Supreme Court precedent to the contrary, and, in respect of the fundamental purpose of the exigent-circumstances doctrine, we conclude that the trial court did not err in denying the motion to suppress when it rejected the destruction-of-evidence rationale offered by the state. However, because we also conclude that the trial court did err when it denied the motion based on the threat-of-harm rationale, we reverse and remand.

The above conclusions obviate any need to address defendant's contentions under the Fourth Amendment.

Reversed and remanded.