Argued and submitted January 14, reversed and remanded July 15, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHRISTOPHER KENNETH KELLY,
*Defendant-Appellant.*

Multnomah County Circuit Court
16CR76786; A167836

469 P3d 851

Defendant appeals from a judgment of conviction, following a conditional plea, for driving under the influence of intoxicants, ORS 813.010, and reckless driving, ORS 811.140. He challenges the trial court's denial of his motion to suppress evidence obtained from a warrantless, unconsented blood draw, contending that no exigency existed to justify the draw because the hospital at which he was receiving treatment had already conducted a blood draw and captured his blood alcohol content. The state contends that the hospital's prior blood draw did not negate the exigency and, thus, the warrantless blood draw was lawful. *Held*: The trial court erred in denying defendant's motion to suppress. There was insufficient evidence in the record to support a finding of exigency at the time of the second blood draw.

Reversed and remanded.

Melvin Oden-Orr, Judge.

Matthew Blythe, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Philip Thoennes, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Reversed and remanded.

**MOONEY, J.**

Defendant appeals from a judgment of conviction, following a conditional plea, for driving under the influence of intoxicants (DUII), ORS 813.010, and reckless driving, ORS 811.140. He challenges the trial court's denial of his motion to suppress evidence obtained from a warrantless, unconsented blood draw, contending that no exigency existed to conduct the draw because the hospital at which he was receiving treatment had already conducted a blood draw and captured his blood alcohol content (BAC). The state contends that the hospital's prior blood draw did not negate the exigency and, thus, the warrantless blood draw was lawful. We conclude that there is insufficient evidence in the record to support a finding of exigency at the time of the second blood draw and that the trial court therefore erred in denying defendant's motion to suppress. Pursuant to ORS 135.335, we reverse and remand so that defendant may withdraw his conditional plea. *State v. Dinsmore*, 182 Or App 505, 519, 49 P3d 830 (2002).

We review the trial court's denial of defendant's motion to suppress for errors of law. *State v. Middleton*, 294 Or App 596, 597, 432 P3d 337 (2018). We are bound by the trial court's findings of fact if they are supported by evidence in the record. *Id.* In the absence of express factual findings, we presume that the court decided the disputed facts in keeping with its ultimate conclusion. *Id.*

We state the following facts, taken from testimony presented at the hearing on defendant's motion to suppress, consistently with that standard. On November 8, 2016, Gresham Police Officer Snider was dispatched at 5:55 p.m. to a car accident. When Snider arrived, defendant was still in the driver's seat of his car, which had flipped upside down. Snider could smell "a strong odor of alcohol" coming from defendant's car and defendant's speech was slurred. Because defendant's car had flipped over and pushed a parked car "back about a car length," Snider believed that defendant was driving faster than the posted speed limit of 25 miles per hour at the time of the accident and had run several stop signs to reach that speed. Medical personnel removed defendant from the car and transported him

to the trauma unit at Oregon Health and Science University Hospital (OHSU).

When defendant arrived at OHSU, medical staff drew his blood and tested it (the medical blood draw) as part of the medical evaluation process. Snider arrived at OHSU at 7:20 p.m., approximately an hour and a half after the accident. By the time he arrived, the medical staff had completed their initial evaluation and testing of defendant, including the blood draw, and they cleared Snider to speak with defendant. Snider advised defendant of his *Miranda* rights and then began asking him questions. During the conversation, defendant's speech was still slurred, and he had an "overwhelming odor" of alcohol. Snider asked how much defendant "had been drinking" to which defendant responded, "not enough." Defendant told Snider that he had been driving 40 to 45 miles per hour. Snider then told defendant that he was under arrest for DUII, read defendant the "rights and consequences from the implied consent form," and asked defendant to consent to a blood draw. Defendant did not consent to the blood draw.

At some point during his investigation, Snider learned that the medical blood draw indicated "there was a blood alcohol level."[1] Snider initially asked hospital staff not to tell him the specific BAC results obtained from the medical blood draw. And, then, without obtaining a warrant, Snider asked a hospital nurse to perform another blood draw (forensic blood draw). Snider testified that he did not attempt to get a warrant in advance of the forensic blood draw because it would have taken "a good three to four hours." The forensic blood draw was performed at 8:28 p.m., about two and a half hours after the accident. Prior to that second blood draw being completed, Snider learned the results of the hospital blood draw. The next day, Snider obtained a warrant to have the forensic blood draw tested. The blood was tested by the Oregon State Police crime lab and confirmed that defendant's BAC was above the amount allowed by law.

---

[1] ORS 676.260 requires a health care facility providing immediate post-motor-vehicle-accident medical care to the presumed driver to notify any investigating law enforcement officer present at the facility of the result of any blood test performed in the course of treatment that reveals a BAC that meets or exceeds the percent specified in ORS 813.010.

Defendant was charged with DUII, ORS 813.010, and reckless driving, ORS 811.140. Prior to trial, he moved to suppress the results of the forensic blood draw, contending that no exigency existed to justify the warrantless search and seizure because the hospital had already completed a blood draw which necessarily preserved any evidence of defendant's BAC. Defendant advanced both state and federal constitutional arguments in support of his motion. The state argued that the first draw did not eliminate the exigency.

The trial court invited counsel to submit any cases or other authority they might find on the effect of an existing medical blood draw on a subsequent forensic blood draw and then recessed to consider the motion. When the parties returned to court, neither had been able to find any such legal authority and the court ruled that "exigent circumstances did exist, notwithstanding [its] concerns about the prior test." Defendant then entered a conditional no-contest plea reserving the right to challenge the denial of his motion to suppress. Defendant appeals, raising essentially the same arguments advanced before the trial court; however, defendant's argument is limited to Article I, section 9, of the Oregon Constitution. He does not develop any argument under the Fourth Amendment to the United States Constitution.

Under the Oregon Constitution, a blood draw conducted by the police is both a search of a person and a seizure of an "effect"—that person's blood—that implicates constitutional protection. *State v. Perryman*, 275 Or App 631, 637, 365 P3d 628 (2015) (citing *State v. Milligan*, 304 Or 659, 664, 748 P2d 130 (1988)). As we have often stated, a warrantless search or seizure is *per se* unreasonable unless it falls "within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). Furthermore, the state bears the burden of proving that a warrantless search or seizure falls within one of those carefully delineated exceptions to the warrant requirement. *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011).

As framed by the parties, the only potentially applicable warrant exception is the "exigent circumstances" exception. That exception "allows the police to conduct a warrantless search or seizure when there is probable cause to arrest and there are 'exigent circumstances.'" *Perryman*, 275 Or App at 637. "Exigent circumstances include, among other things, situations in which immediate action is necessary to prevent the disappearance, dissipation, or destruction of evidence." *State v. Meharry*, 342 Or 173, 177, 149 P3d 1155 (2006). "In the context of a DUII investigation, destruction of evidence is occasioned by the natural dissipation of alcohol from the 'vessel containing evidence of [the] crime'—the human body." *Perryman*, 275 Or App at 637 (quoting *Milligan*, 304 Or at 665). Up to this point, the parties agree.

The parties further agree that, when a person has been legally seized for the crime of DUII, the continual dissipation, or evanescent nature, of the person's BAC presents an exigency that will *ordinarily* permit a warrantless blood draw under Article I, section 9. *State v. Machuca*, 347 Or 644, 657, 227 P3d 729 (2010). The parties disagree, however, about whether this is one of the "ordinary" cases that permits a warrantless blood draw under Article I, section 9.

As mentioned, defendant argues that this is not such a case because the OHSU staff had already conducted a blood draw; therefore, there "was no risk that evidence of defendant's BAC would be lost or reduced to a form that was unusable in a criminal case against defendant." The state contends that the medical draw did not extinguish the exigency because OHSU staff drew and tested defendant's blood for medical purposes, not forensic purposes. The state presents six reasons why that distinction matters: (1) the state needed to control and later prove the chain of custody of its evidence; (2) "the hospital [might] have performed a different type of test than the one used at the state crime laboratory—one that is less accurate"; (3) Snider had no way of knowing whether the hospital used its entire blood sample in performing its BAC test or whether any blood was left for later testing; (4) Snider had no way of knowing, assuming some blood was left over after the hospital's test, if that blood was preserved and available to the state at a later

time; (5) "Snider did not know if anything was added to the hospital's sample that [might] have adulterated it, such as preservatives"; and (6) the state might not be able to identify relevant witnesses to the hospital's testing and thus might be faced with later confrontation problems at trial. The state argues in the alternative that, those reasons notwithstanding, the second blood draw had independent evidentiary value because it could be used to help show whether defendant's BAC was "going up or down."[2]

Because the state bears the burden of proving that an exigency existed, *State v. Nagel*, 320 Or 24, 31 n 6, 880 P2d 451 (1994), we begin with the state's arguments. The state relies principally on *Machuca* and subsequent cases. In *Machuca*, the Oregon Supreme Court reaffirmed its statement in *Milligan* that, when there is an exigency created by the dissipating evidence of blood alcohol, a warrantless search and seizure "is constitutionally justified, *unless a warrant can be obtained.*" *Machuca*, 347 Or at 656 (emphasis added). The court further concluded that, "when probable cause to arrest for a crime involving the blood alcohol content of the suspect is combined with the undisputed evanescent nature of alcohol in the blood, those facts *are a sufficient basis to conclude that a warrant could not have been obtained without sacrificing that evidence.*" *Id.* (emphasis added). The state rests its argument on the following statement in *Machuca*:

> "It may be true, phenomenologically, that, among such cases, there will be instances in which a warrant could have been both obtained and executed in a timely fashion. The mere possibility, however, that such situations may occur from time to time does not justify ignoring the inescapable fact that, in every such case, evidence is disappearing and minutes count. We therefore declare that, for purposes of the Oregon Constitution, the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the kind taken here. We do so, however, understanding that particular facts may show, in the rare case, that a warrant could have been obtained and executed *significantly* faster than the actual process otherwise used under the

---

[2] The state does not argue that the subsequent search warrant was so attenuated from the unlawful seizure that suppression was not necessary.

circumstances. We anticipate that only in those rare cases will a warrantless blood draw be unconstitutional."

*Id.* at 656-57 (emphasis in original).

The state contends that this is not one of the "rare cases" in which a warrant could have been obtained and executed *significantly* faster than the actual process for obtaining a blood draw. In *State v. Martinez-Alvarez*, 245 Or App 369, 376, 263 P3d 1091 (2011), we examined what constitutes a "rare case" under *Machuca*. Initially, we noted that "two basic principles" underscore that analysis: "(1) the actual loss of blood alcohol content by virtue of the passage of time creates an exigency; and (2) generally, the time that it takes to obtain a warrant results in the dissipation of blood alcohol content." *Id.*

"In light of those concerns, we conclude[d] that, whatever else a 'rare case' may mean—and we [did] not purport to define the extremely limited universe of 'rare cases'—it necessarily includes a case in which an objectively reasonable officer would have understood *at the time of the DUII stop and arrest* that a warrant could have been obtained significantly more quickly than the actual time (and consequent dissipation of alcohol) between the probable cause determination and the administration of the breath test or blood draw. Our emphasis [was] quite conscious: The standard is not one of '20/20 hindsight'—rather, it is predicated on an officer's contemporaneous perspective based on information known or reasonably discernible in the totality of the circumstances of the particular encounter."

*Id.* (emphasis in original).[3]

---

[3] We provided this hypothetical as illustrative:

"An officer stops and arrests a motorist for DUII on a highway in a remote area of central or eastern Oregon, miles from the nearest town (and tow truck). The officer cannot transport the suspect to the stationhouse for a breath test until the tow truck arrives to remove the suspect's vehicle—which will take well over an hour. So it will take at least two hours before the breath test can be administered. Although the officer may be engaged during some of that time (*e.g.*, inventorying the vehicle), there will be a significant amount of time that the officer is not otherwise engaged and is simply waiting for the tow truck. Assume further that the record establishes that a reasonably objective officer knows that he or she can generally obtain a telephonic warrant in 30 minutes and that, thus, in the hypothetical circumstance, the warrant would be waiting by the time that the officer and suspect arrive at the stationhouse. Under such circumstances, the 'rare case' exception would apply."

*Martinez-Alvarez*, 245 Or App at 376.

According to the state, Snider was "faced with the exact dynamic identified in *Machuca*: He had probable cause to believe that defendant committed DUII and needed to obtain evidence of defendant's BAC, but that 'evidence was disappearing and minutes count.'" There can be no question that blood-alcohol evidence circulating in a suspect's blood vessels is "in a persistent state of destruction" from the time it is consumed until "fully metabolized by the body." *State v. Ritz*, 361 Or 781, 792, 399 P3d 421 (2017). But, here, a blood draw had already been done. It was the state's burden to establish whether a second blood draw was justified by the dissipating evidence of blood alcohol. And, as explained in *Martinez-Alvarez*, 245 Or App at 376, that requires the state to demonstrate that the officer's subjective belief—that the second draw was needed to adequately preserve evidence of BAC and that obtaining a warrant would have delayed preserving the evidence that was dissipating, *Ritz*, 361 Or at 795—was *objectively reasonable* based on the officer's "contemporaneous perspective based on information known or reasonably discernible in the totality of the circumstance." *Martinez-Alvarez*, 245 Or App at 376.

The state contends that, because that sample was drawn and tested for medical, not forensic, purposes, the medical blood draw did not negate the exigency and it, accordingly, carried its burden. It essentially argues that the medical blood draw might not have been available, might not have been reliable, and might not have been admissible.

Defendant's BAC had been preserved at the point the medical draw was accomplished. The testing of that blood determined and documented the BAC level. The state did not offer evidence that an objectively reasonable officer in Snider's position would have been concerned that the medical blood draw or test results would not be reliable or available as evidence at trial. This case is less like *Machuca*, where the officer properly obtained a warrantless blood draw at the hospital when no blood draw had yet been performed, and is more like *Ritz*, where the Supreme Court held that an officer's warrantless entry into the defendant's home was not justified as exigent, because the state offered no evidence that obtaining a warrant to enter the home would

have delayed preserving the defendant's BAC evidence. 361 Or at 799.

Not only had a blood draw already been completed when the officer arrived at OHSU, that specimen had been tested. Snider was made aware of the blood draw by OHSU staff, but he directed them not to advise him of the test results and instead directed that a second blood draw be done. Those results could have been offered as evidence against defendant. *State v. Fincher*, 303 Or App 165, 166, 462 P3d 780 (2020) (readopting *State v. Miller*, 284 Or App 818, 395 P3d 584, *vac'd*, 362 Or 300, 408 P3d 1079 (2017)). If there was a potential evidentiary problem with a medical blood draw, the state did not offer evidence to the trial court of such a problem. The state did not offer evidence of whether or how the two blood draws might differ either scientifically or evidentiarily. It did not establish how laying a foundation for admission of the medical blood draw and test results might differ materially from laying a foundation for the admission of other hospital specimens in such a way as to create an exigency that only the use of a forensic laboratory or expert could avoid. Neither did it offer evidence that an objectively reasonable officer in Snider's position would have been concerned about such an evidentiary problem. Given the state of the record, we conclude that the state did not carry its burden of proving that an exigency existed to excuse the warrant requirement.

We now move to, and reject, the state's second theory, that the forensic blood draw had independent evidentiary value, justifying warrantless seizure under the exigency exception to the warrant requirement. Defendant argues, and we agree, that the state did not sufficiently develop that argument in the trial court by providing a comparison with defendant's BAC at the time of the medical blood draw. In redirect examination, Snider made a passing reference to the possibility that a second blood draw "could also show if his BAC level's going up or down from the—from the information we got at the hospital." But, that testimony was not pursued, developed, or mentioned again. The state does not request that we affirm under the "right for the wrong reason" doctrine, and we do not exercise our discretion to

do so because we think it likely that the record would have developed differently had the issue been adequately raised. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (to affirm on an alternative bases requires, among other things, that "the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below").

The trial court erred in denying defendant's motion to suppress.

Reversed and remanded.