Submitted June 30, affirmed December 23, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KENDALL WADE PERRYMAN,
*Defendant-Appellant.*

Linn County Circuit Court
13CR00031; A155733

365 P3d 628

Peter Gartlan, Chief Defender, and Kali Montague, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Joanna L. Jenkins, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

Defendant seeks reversal of his conviction for misdemeanor driving under the influence of intoxicants (DUII), ORS 813.010. He contends that the trial court erred in denying his motion to suppress evidence of his blood alcohol content (BAC) obtained through a warrantless, nonconsensual blood draw conducted at a hospital. We conclude that exigent circumstances justified the seizure of defendant's blood, and, therefore, we affirm.

The relevant facts are undisputed. At approximately 1:04 a.m., police received a tip from an employee of a tavern that defendant had driven away from the tavern visibly intoxicated. Based on that tip, and after observing defendant commit several traffic infractions, Officer Mickelsen stopped defendant at 1:07 a.m. During that stop, Mickelsen noted that defendant exhibited several signs of intoxication. At 1:26 a.m., Mickelsen placed defendant under arrest for DUII and began reading him his *Miranda* rights. At that time, however, defendant began hyperventilating and breathing heavily "to the point where he appeared to need some kind of service or help." Mickelsen allowed defendant to use his inhaler, which temporarily eased his breathing. Mickelsen finished reading defendant his *Miranda* rights and asked him whether he was willing to answer questions. Defendant agreed, but his breathing difficulties soon resumed. At that point, Mickelsen offered to call for medical assistance. Defendant agreed, and a team of emergency medical technicians (EMTs) arrived at the scene. The EMTs told Mickelsen that defendant was either putting on "a performance or *** show," or his breathing problems were entirely "psychological." At defendant's request, however, the EMTs transported him to the hospital.

Defendant arrived at the hospital at 2:04 a.m., followed by Mickelsen. Although medical staff informed Mickelsen that defendant's condition "was not really anything," they treated defendant and encouraged him to "calm down" and "relax" to control his breathing. Mickelsen asked defendant if he would consent to a blood draw. Defendant did not respond and continued to breathe heavily. At approximately 2:30 a.m., Mickelsen asked another officer to bring

a blood draw kit to the hospital. At 2:45 a.m., over defendant's objections, a phlebotomist took a blood sample from defendant. A subsequent chemical analysis of that sample revealed a BAC of .14 percent.

Defendant was charged with DUII, ORS 813.010.[1] He moved to suppress the evidence of his BAC obtained through the warrantless blood draw, arguing that it was unconstitutional under both Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution. At the hearing on that motion, the sole issue was whether exigent circumstances justified Mickelsen's failure to obtain a warrant. The state argued that, because the encounter had been initiated in part based on an eyewitness's tip, and because defendant did not perform field sobriety tests, it would have taken Mickelsen longer than usual to evaluate the evidence to demonstrate probable cause for a warrant. In support of that argument, the state offered Mickelsen's testimony that he would have needed to contact the eyewitness and review the video from his patrol car to accurately convey all of the facts known to him to the reviewing judge.

Mickelsen also testified that, in a best case scenario, it would have taken him approximately two and one-half hours to obtain a warrant for defendant's blood:

"So, an example of this, we arrived at the hospital at 2:04 and let's say that as soon as I arrive I go, 'I need to apply for a search warrant.' The first thing I need to do is secure an officer that can come to the hospital to watch over [defendant]. Let's say best case scenario on a Saturday night within 15 minutes I can get an officer there to relieve me, so that would be about 2:15 where I could leave the hospital and go to the station. I'd arrive at the station about five minutes later at 2:20, I could start downloading the videos while I'm typing up the affidavit, then I can review the video to get all of the accurate information for that affidavit. Typing this up and reviewing the video is going to take about an hour and a half, best case scenario. So by 3:50 * * * it would be all typed up and ready to go, from there

[1] Defendant was also charged with and convicted of unlawful possession of less than one ounce of marijuana, ORS 475.864, and refusal to take a test for intoxicants, ORS 813.095. Defendant does not challenge those convictions on appeal.

whether I do a telephonic [warrant] or I contact a judge * * * I can be at [the judge's] house [in] 10 minutes. Now that would be * * * a best case scenario. That would be 4:00 that I could be at a judge's house and we could review over the information and he can either agree to the search warrant or not agree. Let's say if he does agree to it let's say we're done in 15 minutes, he * * * signs the warrant. That's 4:15 that he would sign the warrant. I could drive back to the hospital * * * in five minutes, that would put me at the hospital at 4:20 and that would give me another maybe five to 10 minutes to find a phlebotomist that would do the blood draw. At that time [it is] 4:30. So best case scenario I could have that blood drawn by 4:30."

Mickelsen further testified that, on average, alcohol dissipates from the body at a rate of .015 percent per hour, and that a substantial delay in obtaining a blood sample risks the loss of BAC evidence.

Defendant questioned Mickelsen about the option to obtain a telephonic warrant pursuant to ORS 133.545(6).[2] That statute allows the use of a recorded oral statement made under oath as the basis for a search warrant in place of a written affidavit of probable cause. Mickelsen testified that, although he was familiar with his department's telephonic warrant policy, it was his understanding that a written affidavit of probable cause was still required. That written affidavit, Mickelsen explained, would then be read to a judge over the telephone, on one of the recorded lines at the police station. Thus, according to Mickelsen, the only time saved by obtaining a telephonic warrant would be the time that it would otherwise take to drive to and from the judge's home to present the written affidavit in person.

At the conclusion of the hearing, the trial court denied defendant's motion to suppress. In doing so, the court

---

[2] ORS 133.545(6), provides, in part:

"Instead of the written affidavit described in subsection (5) of this section, the judge may take an oral statement under oath. The oral statement shall be recorded and a copy of the recording submitted to the judge who took the oral statement. In such cases, the judge shall certify that the recording of the sworn oral statement is a true recording of the oral statement under oath and shall retain the recording as part of the record of proceedings for the issuance of the warrant. The recording shall constitute an affidavit for the purposes of this section."

agreed with the state that the circumstances of this case presented an exigency that excused the requirement to obtain a warrant:

> "I think this case is unique for a couple reasons. One of them is that I think the police officer is correct in his observation that in order to establish probable cause in this case he would have needed to tell the judge about the—it wouldn't be testimony but the statements made by the witness who viewed the defendant near—at or near the tavern location. And to do that reliably an officer may well have to either record or write down those statements because otherwise he's relying entirely on his memory which could be faulty and then that could lead to a challenge to a—to the search warrant to begin with, and that would take some time.

> "The other thing that I think is unique about this situation is that the defendant did not perform field sobriety tests and so the officer is limited in certain ways he might not otherwise be limited in terms of accumulating sufficient probable cause facts that he could relate to the judge, which means it would have taken longer and in this case did in fact take longer.

> "So, while I don't find it probably would have taken two and a half hours to get a telephonic search warrant, I do find that obtaining a telephonic search warrant in this case probably would have led to a significant risk of loss of evidence which meant that exigent circumstances existed. The motion is denied."

Defendant entered a conditional plea of no contest and was convicted. On appeal, in challenging the denial of his motion to suppress the BAC evidence, he renews his arguments for suppression below, citing both Article I, section 9, and the Fourth Amendment. Thus, the sole issue on appeal is whether the circumstances of defendant's stop created an exigency that excused the failure to obtain a warrant prior to the blood draw.

"We review the trial court's denial of a motion to suppress for legal error and 'are bound by the trial court's findings of historical fact that are supported by evidence in the record.'" *State v. Sjogren*, 274 Or App 537, 538, 361 P3d 633 (2015) (quoting *State v. Holdorf*, 355 Or 812, 814,

333 P3d 982 (2014)). If findings are not made on all such facts and there is evidence from which such facts could be decided more than one way, we presume that the facts were decided in a manner consistent with the trial court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

A blood draw conducted by the police is simultaneously a search of a person and a seizure of an "effect"—that person's blood. *State v. Milligan*, 304 Or 659, 664, 748 P2d 130 (1988); *see also Schmerber v. California*, 384 US 757, 767, 86 S Ct 1826, 16 L Ed 2d 908 (1966). Moreover, the extraction of blood necessarily implicates constitutional protections under both the Oregon and federal constitutions. *Id.* We begin our analysis with defendant's state constitutional claims. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) ("The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim.").

Article I, section 9, guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." A warrantless search or seizure is presumptively unreasonable unless it falls "within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). The state bears the burden of proving that circumstances were sufficient to satisfy an exception to the warrant requirement. *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011). One such exception allows the police to conduct a warrantless search or seizure when there is probable cause to arrest and there are "exigent circumstances." *State v. Sullivan*, 265 Or App 62, 67, 333 P3d 1201 (2014). "Exigent circumstances include, among other things, situations in which immediate action is necessary to prevent the disappearance, dissipation, or destruction of evidence." *State v. Meharry*, 342 Or 173, 177, 149 P3d 1155 (2006).

In the context of a DUII investigation, destruction of evidence is occasioned by the natural dissipation of alcohol from the "vessel containing evidence of [the] crime"—the human body. *Milligan*, 304 Or at 665. In *State v. Machuca*,

347 Or 644, 657, 227 P3d 729 (2010), the Supreme Court held that, for the purposes of Article I, section 9, when a suspect has already been validly seized for the crime of DUII, the evanescent nature of that suspect's BAC presents an exigency that will ordinarily permit a warrantless blood draw. In *Machuca*, the defendant was transported to a hospital after suffering injuries in an accident. *Id.* at 646. Based on probable cause to believe that the defendant had committed the crime of DUII, the defendant's blood was drawn without a warrant. *Id.* at 646-47. Before trial, the defendant moved to suppress the blood alcohol evidence, arguing that the warrantless blood draw violated his rights under Article I, section 9. *Id.* at 647. The state responded that the dissipation of alcohol in the bloodstream constituted an exigency that, coupled with probable cause to believe that the defendant had been driving under the influence of intoxicants, excused the warrant requirement. *Id.*

The Supreme Court upheld the trial court's denial of the defendant's motion to suppress. In doing so, the *Machuca* court announced the following rule with regard to warrantless blood draws in the context of DUII investigations:

> "It may be true, phenomenologically, that, among such cases, there will be instances in which a warrant could have been both obtained and executed in a timely fashion. The mere possibility, however, that such situations may occur from time to time does not justify ignoring the inescapable fact that, in every such case, evidence is disappearing and minutes count. We therefore declare that, for purposes of the Oregon Constitution, the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the kind taken here. We do so, however, understanding that particular facts may show, in the rare case, that a warrant could have been obtained and executed *significantly* faster than the actual process otherwise used under the circumstances. We anticipate that only in those rare cases will a warrantless blood draw be unconstitutional."

*Id.* at 656-57 (emphasis in original). We have recognized that that rule, although broad, is not absolute. *See State v. Raymond*, 274 Or App 409, 416, 360 P3d 734 (2015). That is, by carving out an exception for the "rare case" in which a warrant could be obtained and executed significantly faster

than the "actual process otherwise used under the circumstances," the *Machuca* court stopped short of announcing a *per se* rule with respect to exigency in the DUII context.

We examined the "rare case" exception in *State v. Martinez-Alvarez*, 245 Or App 369, 263 P3d 1091 (2011). There, we explained that "whatever else a 'rare case' may mean * * * it necessarily includes a case in which an objectively reasonable officer would have understood *at the time of the DUII stop and arrest* that a warrant could have been obtained significantly more quickly than the actual time (and consequent dissipation of alcohol) between the probable cause determination and the administration of the breath test or blood draw." *Id.* at 376 (emphasis in original). That standard is based not on "20/20 hindsight," but, rather, on the officer's contemporaneous perspective formed from the totality of the circumstances of the particular encounter. *Id.* To illustrate that concept, we provided the following hypothetical:

> "An officer stops and arrests a motorist for DUII on a highway in a remote area of central or eastern Oregon, miles from the nearest town (and tow truck). The officer cannot transport the suspect to the stationhouse for a breath test until the tow truck arrives to remove the suspect's vehicle—which will take well over an hour. So it will take at least two hours before the breath test can be administered. Although the officer may be engaged during some of that time (*e.g.*, inventorying the vehicle), there will be a significant amount of time that the officer is not otherwise engaged and is simply waiting for the tow truck. Assume further that the record establishes that a reasonable objective officer knows that he or she can generally obtain a telephonic warrant in 30 minutes and that, thus, in the hypothetical circumstance, the warrant would be waiting by the time that the officer and suspect arrive at the stationhouse. Under such circumstances, the 'rare case' exception would apply."

*Id.* Thus, as interpreted in *Martinez-Alvarez*, the "rare case" includes one in which circumstances at the time of the arrest are such that a reasonable officer would understand that a warrant could readily be obtained before the earliest time that a test of a defendant's blood or breath could occur.

We have observed that *Machuca* was the "last in a line of Oregon search-and-seizure cases to address a recurring and very particular dynamic: a blood draw taken from a suspect who had been seized and was at the hospital at the time that the blood draw was sought." *Sullivan*, 265 Or App at 76. The case before us fits squarely within that construct. As in *Machuca*, defendant was lawfully seized based on probable cause that he had committed the crime of DUII (a point that defendant does not dispute). And, as in *Machuca*, defendant was taken to a hospital where he was subjected to limited testing designed to detect impairment, performed by licensed medical personnel. That testing was based on probable cause to believe that evidence of the crime would be found in defendant's blood. Moreover, the state presented evidence that alcohol dissipates from the human body at a rate of .015 percent per hour. Under *Machuca*, that proof was sufficient to establish an exigency that ordinarily permits a warrantless seizure of the blood.

Nor is this the "rare case" in which "a warrant could have been obtained and executed *significantly* faster than the actual process otherwise used under the circumstances." *Machuca*, 347 Or at 657 (emphasis in original). Mickelsen testified that the normal process for obtaining a warrant would have taken approximately two and one-half hours. Although the trial court indicated some doubt that it would necessarily have taken that long, there is no basis in the record from which to conclude that a warrant could have been obtained "significantly faster" than what Mickelsen described.[3] The record reflects that, unlike in the hypothetical scenario envisioned in *Martinez-Alvarez*, Mickelsen was actively engaged with defendant throughout the encounter and had no significant or predictable "down time" during

---

[3] Defendant contends that Mickelsen was not required to create a written affidavit of probable cause and that a warrant could have been obtained significantly faster if Mickelsen had "correctly understood the telephonic warrant process." However, defendant points to no evidence in the record to suggest that Mickelsen was mistaken in his understanding of the department's telephonic warrant policy. Moreover, even assuming that a written affidavit was not required, the trial court found that, prior to obtaining a telephonic warrant, Mickelsen would have needed to review the evidence to enable him to accurately describe the basis for the warrant application. Nothing in the record suggests that *that* process would have been significantly faster than the actual process otherwise used under the circumstances.

which he could have worked to obtain a warrant. Thus, the state's evidence was sufficient to establish an exigency justifying the warrantless seizure of defendant's blood under Article I, section 9.

For the same reasons that defendant's arguments fail under the state constitution, his arguments under the federal constitution are also unavailing. Under the Fourth Amendment, a warrantless, nonconsensual blood draw is reasonable if it is based upon probable cause to arrest the suspect for DUII, it occurs under exigent circumstances, and the procedures used to extract the suspect's blood are reasonable. *See Schmerber*, 384 US at 768-72. In *Schmerber*, the United States Supreme Court upheld the admission into evidence of a warrantless, nonconsensual blood draw of a person who had been involved in an accident and suspected of driving under the influence of alcohol. The Court emphasized that, "[p]articularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident," an officer could have reasonably believed that he was confronted with an emergency which threatened the destruction of evidence. *Id.* at 770-71. Additionally, the Court indicated that the manner in which the defendant's blood was seized—"by a physician in a hospital environment according to accepted medical practices"—was reasonable. *Id.* at 771. On those facts, the Court concluded that the defendant's right to be free of unreasonable searches and seizures under the federal constitution had not been violated. *Id.* at 772.

More recently, in *Missouri v. McNeely*, 569 US ___, 133 S Ct 1552, 185 L Ed 2d 696 (2013), the United States Supreme Court resolved the split of authority following the decision in *Schmerber* as to whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies warrantless, nonconsensual blood testing in all DUII cases. There, the defendant was stopped for committing several traffic infractions. During the stop, the investigating officer noticed several signs of intoxication, prompting him to administer field sobriety tests. *Id.* at ___, 133 S Ct at 1556-57. The defendant performed poorly on those tests and declined to take a portable breath test to measure his BAC. Consequently, the defendant was placed under

arrest and transported to a nearby hospital for blood testing. Approximately 30 minutes after the initial stop, and despite the defendant's refusal to consent to a blood draw, a hospital lab technician drew a sample of the defendant's blood. *Id.* at ___, 133 S Ct at 1557.

In *McNeely*, the state did not argue that exigent circumstances existed because a warrant could not have been obtained within a reasonable amount of time. *Id.* at ___, 133 S Ct at 1567. Rather, the investigating officer admitted that he chose to forgo applying for a warrant *solely* because he believed it was not necessary to obtain a warrant, and not, because a warrant would be difficult or time consuming to procure. *Id.* at ___, 133 S Ct at 1567. Based on that testimony, the trial court concluded that no exigency existed to permit the warrantless blood draw. *Id.* at ___, 133 S Ct at 1567.

The Court held that, although the natural dissipation of alcohol in the bloodstream "may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically." *Id.* at ___, 133 S Ct at 1563. Rather, in circumstances where the police can reasonably obtain a warrant before a blood sample can be drawn without "significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at ___, 133 S Ct at 1561. In doing so, the Court reaffirmed the rule in *Schmerber* that a determination of whether a warrantless, nonconsensual blood draw is constitutional depends upon the totality of the circumstances in each case. *Id.* at ___, 133 S Ct at 1559-60. And, although the natural dissipation of alcohol from the bloodstream may be factored into that determination, it is insufficient, by itself, to establish exigency.

Here, unlike in *McNeely*, the state presented evidence that the warrant application process would have significantly increased the delay in obtaining defendant's BAC evidence. And, as observed by the *McNeely* Court, because BAC decreases gradually after a person stops drinking, "a significant delay in testing will negatively affect the probative value of the results." 569 US at ___, 133 S Ct at 1560-61. Moreover, the circumstances in this case are materially

indistinguishable with respect to exigency from those found sufficient to uphold a warrantless, nonconsensual blood draw in *Schmerber*. As in *Schmerber*, time was spent attending to defendant's medical needs. That extended stop increased the risk of compromising the probative value of the BAC evidence. By the time that defendant arrived at the hospital, approximately one hour had elapsed since Mickelsen initiated the stop. In light of Mickelsen's belief that it would have taken another two and one-half hours to obtain a warrant, it was not unreasonable for Mickelsen to conclude that he faced an emergency that justified acting without a warrant.

Defendant relies on *McNeely* for the proposition that, in this case, contrary to Mickelsen's testimony at the suppression hearing, police could have reasonably obtained a warrant prior to seizing his blood without undermining the efficacy of that search. Specifically, defendant argues that the availability of telephonic warrants under ORS 133.545(6) renders unjustified and unconstitutional the police department's policy requiring officers to prepare a written affidavit of probable cause in every case. Defendant's argument, however, finds little support in *McNeely*. Although technological developments in the warrant process are considered in assessing exigency, as the *McNeely* Court observed, exigent circumstances may still arise due to "practical problems of obtaining a warrant within a timeframe that * * * preserves the opportunity to obtain reliable evidence." *Id.* at ___, 133 S Ct at 1568. Those problems, the Court suggested, include delays resulting from the procedures in place for obtaining a warrant, the availability of a magistrate judge, and other formalities designed to create an adequate record. *Id.* at ___, ___, 133 S Ct at 1562, 1568 ("Warrants inevitably take some time for police officers or prosecutors to complete and for magistrate judges to review. Telephonic and electronic warrants may still require officers to follow time-consuming formalities designed to create an adequate record, such as preparing a duplicate warrant before calling the magistrate judge."). Based on the record before us, including the trial court's finding that Mickelsen would have needed to review the evidence before applying for a warrant, the anticipated delay in obtaining a warrant in this case justified the warrantless seizure of defendant's blood. *McNeely*

does not counsel otherwise. *Id.* at 1568 ("No doubt, given the large number of arrests for [DUII] in different jurisdictions nationwide, cases will arise when anticipated delays in obtaining a warrant will justify a blood test without judicial authorization, for in every case the law must be concerned that evidence is being destroyed.").[4]

For the foregoing reasons, we conclude that the trial court did not err in denying defendant's motion to suppress evidence of his BAC.

Affirmed.

---

[4] Defendant also contends that other officers were available to assist Mickelsen, thereby freeing him to begin the application for a warrant. According to Mickelsen, the other officer at the scene was occupied with securing and inventorying defendant's vehicle. There is nothing in the record to support defendant's suggestion that Mickelsen could have obtained additional help and chose not to. Accordingly, defendant's argument rests on a number of factual suppositions that were for the trial court to consider in the first instance. And, although the trial court made no specific findings of fact on that subject, we can infer that those facts were decided in a manner consistent with the trial court's ultimate conclusion.