Argued and submitted May 9, 2019, affirmed May 19, petition for review denied September 30, 2021 (368 Or 597)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MITCHELL KEITH STEPHENS,
*Defendant-Appellant.*

Klamath County Circuit Court
17CR19402; A166474

493 P3d 2

Defendant appeals a conviction of second-degree manslaughter and two counts of driving under the influence of intoxicants. In connection with a fatal collision, police arrested defendant and subjected him to warrantless blood draws. The trial court denied defendant's motion to suppress evidence obtained from the warrantless blood draws, concluding they were justified by exigent circumstances. Defendant assigns error to the denial of his motion to suppress as well as imposition of restitution. *Held*: The trial court did not err in denying defendant's motion to suppress the results of the warrantless blood draws under the Fourth Amendment to the United States Constitution. The totality of the circumstances (including the dissipating evidence of defendant's blood-alcohol content, the amount of time that already had elapsed since the collision, and the unavailability of other law enforcement resources) created an exigency that justified the warrantless blood draws. With respect to restitution, although the deceased victim's surviving spouse had settled claims with defendant's insurer on behalf of the victim's estate, that settlement did not preclude the surviving spouse from being entitled to restitution as an individual victim in his own capacity.

Affirmed.

Andrea M. Janney, Judge.

Thaddeus Betz argued the cause and filed the briefs for appellant.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and Aoyagi, Judge, and Hadlock, Judge pro tempore.

HADLOCK, J. pro tempore.

Affirmed.

**HADLOCK, J. pro tempore**

While driving down a straight stretch of road during daylight hours, defendant hit a bicyclist who was riding on the road's shoulder. The bicyclist died. Defendant did not stop, and he later expressed belief that he had hit a deer. A police investigation revealed evidence that defendant had been intoxicated when he hit the bicyclist. Defendant moved to suppress evidence of his intoxication, and the trial court suppressed some, but not all, of that evidence. Defendant then entered conditional guilty pleas to one count of second-degree manslaughter and two counts of driving under the influence of intoxicants (DUII). As part of the sentence for those convictions, the trial court ordered defendant to pay $101,335.74 in restitution to the manslaughter victim's husband, D. On appeal, defendant raises issues related both to the partial denial of his suppression motion and to the award of restitution. We reject each of defendant's arguments and, therefore, affirm.

We begin by addressing defendant's first three assignments of error, which challenge the trial court's rulings on aspects of defendant's suppression motion. "We review trial court rulings on motions to suppress for legal error, deferring to the trial court's explicit and implicit factual findings where there is evidence in the record to support them." *State v. Pryor*, 309 Or App 12, 18, 481 P3d 340 (2021). We set out the pertinent facts, as established through evidence presented during the suppression hearing, in keeping with that standard of review.

Oregon State Trooper Hargis was on patrol at 5:50 p.m. on a clear day in late August 2016 when he heard a 9-1-1 request for assistance at a collision on a road in Lake County. Hargis drove to the collision scene, which he described as being on "a long straight stretch" of road where "you can see for at least a mile, there's no shrubs, there's no bushes in the way." Hargis saw the victim, who was wearing a fluorescent jacket, but he could not identify her. Hargis saw a shoe over the fog line, out of the lane of travel. Hargis also saw some "gouges which we see commonly on vehicle crashes, some kind of metal object or hard object skidding across the pavement," as well as a "mangled" bicycle. Those

gouges, like the shoe, were over the fog line. Pieces from a vehicle were also present, including what looked to Hargis like the cover for a fog light.

A second state trooper, Tague, also responded to the call. Tague saw the victim's husband at the scene and realized who had been killed. Another person indicated that defendant had been involved in the crash.

Hargis, who had known defendant for years, called defendant's wife and told her that he needed to speak to defendant. Defendant returned Hargis's call at 6:38 p.m. Defendant was upset and crying, his speech was slurred, and he said that he thought he had hit a deer. Defendant agreed to show Hargis his truck, which he had left at a ranch, and they agreed to meet at a specific location a few miles outside of town.

Hargis found several people at that spot, including defendant and two other men (Kerr and Leal). Hargis noticed that defendant's eyes were bloodshot and glassy, his speech was "slurring at times," and his breath had a "moderate odor of alcohol." Defendant "was reiterating that he had just hit a deer." After a minute or two, one of the other people present drove defendant to the place where defendant had left his truck, and Hargis followed.

It took a few minutes to drive to defendant's truck, which Hargis could see was parked behind the gate to a ranch. The hood, right front headlight area, and fender well of the truck were damaged, "consistent with a right side strike." Given the information that he had, Hargis "had no doubt that that was the vehicle that struck [the victim]." Hargis noted that the truck's right "fog marker cover" was gone, and the one on the opposite side of the truck matched the evidence at the collision scene. At about 7:00 p.m., Tague arrived to provide backup.

Defendant was still upset and repeated that he "thought [he] hit a damn deer." Defendant said that the collision had happened at maybe about 5:30 p.m. Hargis felt that "the evidence was overwhelming," and he read defendant his *Miranda* rights, which defendant said he understood. Defendant then told Hargis that he had been heading

to meet with Leal and Kerr to go hunting when he saw some deer cross the road, so he slowed down "and then \*\*\* got down the road a little bit further and bam, I mean just—." Defendant said that he had not seen anything and "didn't even think, \*\*\* just kept on going." Defendant went to one of the other men's houses, then they drove to the ranch, where he parked his truck.

Hargis asked defendant, "Have you been drinking?" Defendant initially said no, but then said that he had drunk one beer "after [he] got here." Hargis then asked defendant if he would go to the hospital to give urine and blood samples. Defendant said that he did not want to. Hargis replied, "Okay. Well, [defendant], I'm going to ask you to do a field sobriety test for me today, voluntarily." Some discussion ensued, during which defendant questioned the need for field sobriety tests (FSTs). However, defendant ultimately said, "Oh, okay." While Hargis spoke with defendant, he continued to observe that defendant's breath had an odor of alcohol, he "would slur his words," and his eyes were bloodshot, glassy, and watery. Hargis testified at the suppression hearing that "one beer wasn't consistent with what [he] was seeing."

Before he administered FSTs, Hargis spoke with Leal and Kerr, who were also present at the ranch gate. Leal told Hargis that defendant had showed up at Leal's house and said that he had hit a deer. Leal had expected defendant to arrive at 5:00 p.m. but he was a little early. Hargis knew from defendant that the collision occurred on his way to Leal's house and, therefore, that the collision must have occurred before 5:00 p.m., even though defendant had estimated that it happened at about 5:30 p.m. Hargis testified at the suppression hearing that he understands, from his training and experience, that people who are under the influence of alcohol can have "slowed" internal clocks and "can be off on their times, delayed."

Hargis asked Leal and Kerr whether they had been drinking with defendant after he had his accident, and Leal said that defendant had one beer at Leal's house. Kerr said that he had not consumed any alcohol with defendant. Hargis understood from the conversation that Leal and Kerr

were indicating that defendant had drunk only one beer at the house "before they left to the ranch."

After that conversation, Hargis administered the horizontal gaze nystagmus (HGN) test to defendant, starting around or after 7:00 p.m. He told defendant that he was not going to administer certain physical tests because of the type of ground and gravel that the men were standing on. After explaining why he would not give defendant those particular tests, Hargis asked defendant if he was "willing to do a couple more." Defendant responded affirmatively. Hargis instructed defendant to recite a portion of the alphabet, then instructed him to count forward and backward from certain numbers.

Hargis, who has conducted about 100 DUII arrests and has had multiple trainings in administering the HGN test, testified that defendant showed six out of six clues of intoxication on that test, including "very obvious" sustained jerky movements of his eyes. That test result was not consistent with defendant's assertion that he had drunk only one beer. Hargis also felt that defendant showed signs of impairment in taking the other two tests.

After defendant's poor performance on the FSTs, Hargis told defendant that he thought defendant had had more than one beer. He again asked defendant to voluntarily give urine and blood samples. Defendant again refused.

Hargis testified at the suppression hearing that he had decided to administer FSTs without first seeking a warrant because over two hours had already elapsed since the time of the collision, it would take "a relatively significant time to get back into town with the process" and he was concerned about blood alcohol dissipation. In particular, Hargis testified that "there's no cell service in that particular area" and he would have needed to go into town, watch "his video," write his affidavit (which his supervisor would have had to proofread), submit the affidavit to the district attorney's office "to be approved to make any changes, find the Judge, have it proofed and then have it signed and then go back." Hargis estimated that it would take "two to three hours conservatively" to get a warrant depending in part "on where the Judge is." Hargis also would have had to get

somebody else to watch defendant at the scene while Hargis obtained the warrant. And, he testified, "this was basically a homicide scene for us so everybody was involved at the crash scene and dealing with that evidence."

Hargis arrested defendant for DUII at 7:09 p.m. Hargis and Tague arranged for defendant's truck to be towed so it could be seized as evidence. The tow truck arrived at the ranch at about 8:05 p.m. and left with defendant's truck at 8:21 p.m., with Tague following.

By this point, Hargis had decided to transport defendant to the hospital for a blood draw, and he asked dispatch to send a "second unit" to the hospital because he thought defendant might "have issues" there, having made clear that he did not want to give a blood sample. That request was initially denied because no other officers were available, but Hargis objected, and another deputy (Pore) ended up going to the hospital. During their drive to the hospital, defendant told Hargis for the first time that he had not drunk just one beer but had "had a couple beers on the ranch." Even so, Hargis still thought that defendant was more impaired than would have been caused by the beers that he acknowledged drinking. Also, neither Kerr nor Leal, who had been with defendant at the ranch, had said that he drank beers there.[1]

Hargis and defendant arrived at the hospital at about 7:30 p.m. A phlebotomist arrived and drew defendant's blood at 7:51 p.m. During the 20-minute period preceding the blood draw, Hargis did not feel that he had time to start working on an application for a search warrant because, even though defendant was cooperative at that point, he had been "complaining about resisting" and Hargis considered him a flight risk. In addition, there was no "down time" in which Hargis could have started writing a warrant. After the initial blood draw, Hargis knew that a second draw would occur in an hour. During that interval, defendant volunteered to give a urine sample, which he did. Hargis still did not feel that he could start the warrant process at that

---

[1] At some point later that evening, Kerr suggested to Tague that defendant had "slugged two [beers] down after he got the call." Tague later passed that information on to Hargis. Hargis testified that he received that information about "slammed" beers only after the blood draws had been performed.

point because "everyone else [was] tied up with [another call] and the crash scene" and Hargis was "stuck with the Defendant who [was] not wanting to cooperate entirely," one of defendant's family members was at the hospital, and only one other officer was present (Pore). Hargis was also concerned about comments that defendant made to his family member, "saying it's over, making statements like that which led [Hargis] to believe he was suicidal."

The second warrantless blood draw occurred at 8:52 p.m. Hargis then transported defendant to the jail. By that point, Tague had returned to town, and Hargis gave him the blood and urine evidence to secure.[2] Hargis then reviewed the video from his car's "dash cam" and went to the district attorney's office to write an affidavit for a search warrant. Hargis dictated and the district attorney typed because they "were trying to be expeditious." A judge signed the search warrant just before 11:30 p.m., meaning it had taken about two and one-half hours "to get that process done after [Hargis's] sergeant *** reviewed it and we went and found the Judge in his chambers." Blood was drawn from defendant pursuant to that warrant at 11:59 p.m. A final blood draw was taken about an hour later, resulting in a total of four samples having been taken.[3]

At the suppression hearing, Hargis testified that "a standard DUI warrant takes at least two or three hours if you're rushing through it," and he has "had them take as long as five or six." Getting a telephonic warrant involves "virtually the same process other than you just get to read it, like if the Judge isn't available." If Hargis had pursued that process, he would have had to write out the warrant anyway to have something to read to the judge.

Defendant called two other police officers to testify at the suppression hearing. One of those officers testified

---

[2] Tague collected the blood and urine samples from Hargis shortly after 9:00 p.m. He later met two detectives who arrived from Klamath Falls between about 9:30 p.m. and 10:00 p.m., and he helped those detectives locate witnesses, ending his workday at about 10:15 p.m.

[3] The trial court suppressed the results from the latter two blood draws, taken pursuant to warrant, on the ground that the search warrant affidavit did not establish probable cause. That aspect of the trial court's ruling is not at issue on appeal.

that seven law enforcement officers, in addition to the district attorney, were at the location of the collision at some point before 9:00 p.m., when the scene was cleared and the road reopened. Although that officer was focused on his own duties (taking photographs), all of the officers looked busy to him; he did not see any officers "look like they were twiddling their thumbs." The other officer called by defendant testified about his own investigatory activities.

Defendant was charged with first-degree manslaughter, two counts of misdemeanor DUII, and failure to perform the duties of a driver. Defendant subsequently filed a motion to suppress, in which he argued, among other things, that the trial court should suppress evidence of his performance on FSTs, the blood alcohol content (BAC) results from the two warrantless blood draws, and statements that defendant made following his arrest. As pertinent here, defendant made two distinct arguments. First, defendant argued that Hargis arrested him without having probable cause that he had committed DUII and, accordingly, that "the search consisting of [FSTs], arrest of Defendant, and warrantless and unconsented taking of [defendant's] blood" violated the state and federal constitutional prohibitions against unreasonable searches and seizures. Second, defendant argued that no exigency justified the warrantless blood draws.

In response, the state argued, among other things, that Hargis had probable cause to arrest defendant for DUII before he asked defendant to perform FSTs and that, even if the trooper had lacked probable cause at that point, defendant had voluntarily consented to perform the FSTs (which, in combination with the trooper's previous observations, gave the trooper probable cause to arrest defendant for DUII). The state also argued that exigency justified the warrantless blood draws "due to the loss of evidence inherent in the dissipation of alcohol from the body as well as the time that had elapsed from the time of the crash."

The trial court rejected defendant's arguments regarding the FSTs and the warrantless blood draws in a detailed letter opinion. Defendant then entered a conditional guilty plea to second-degree manslaughter and two

counts of DUII. The charge of failure to perform the duties of a driver was dismissed. Restitution proceedings followed, which we describe later in this opinion.

On appeal, defendant first challenges the trial court's rejection of his argument that he was unlawfully arrested in the absence of probable cause for DUII and, therefore, he was entitled to suppression of subsequently discovered evidence. In his second assignment of error, defendant argues that the trial court erred when it rejected his argument that it should suppress the results of defendant's FSTs because he did not voluntarily consent to perform those tests. We reject both of those arguments without discussion, noting only that neither of the trial court's rulings was erroneous.

We address defendant's third assignment of error at more length. As noted, defendant argued to the trial court that no exigent circumstances had justified the warrantless searches of his blood, that is, the two warrantless blood draws. In rejecting that argument, the trial court set forth its reasoning as follows:

"The warrantless blood draws are * * * admissible based on exigent circumstances. The length of time that had elapsed since the time of the crash, in combination with the numerous indications of impairment observed by the officer, certainly gave rise to exigency. The court does not believe this case presented circumstances where a warrant could have been obtained and executed significantly faster than under normal circumstances. The evidence on the record was clear that Trooper Hargis was very concerned about the length of time it would take to get a warrant. This concern was justified based on his experience working in the area and his personal knowledge of how long it would take him to go through all of the steps necessary to obtain the warrant. This was compounded by the amount of available manpower due to the crash, and the actual dispatch call notifying him there was no one available to meet him at the hospital. His observations of defendant, knowledge of the timing of the crash, his concern about the amount of alcohol actually consumed, and his knowledge regarding the dissipation of alcohol over time, certainly presented exigent circumstances to obtain the warrantless blood draws."

On appeal, defendant reiterates his argument that the warrantless blood draws violated the Fourth Amendment to the United States Constitution because the state did not prove the existence of an exigency. In particular, defendant asserts that Hargis made no effort to obtain a warrant for the first blood draw and that, after the first draw had occurred, "both Trooper Hargis and Deputy Pore did nothing except sit in a hospital room and observe[] *** Defendant." Defendant suggests that Hargis could have applied for a warrant while Pore "secured" defendant, which "could have resulted in a timely warrant," or that other law enforcement officers or staff from the nearby jail could have assisted, with the same result. In addition, defendant contends that "there is no reason to believe" that additional delay in obtaining the blood samples would have rendered the resulting evidence useless. In summary, defendant contends that "the failure to engage police resources, failure to take advantage of electronic applications, and failure to even attempt to begin the warrant process yields the warrantless seizures unreasonable under the Fourth Amendment."

In response, the state emphasizes evidence indicating that, because defendant consumed alcohol after the collision, an ordinary retrograde analysis of his blood could not establish his BAC at the time of that crash. For that reason, the state argues, it needed "to determine defendant's BAC as quickly as possible and then confirm that his BAC was again dissipating after the post-crash drinking," so it could account for what portion of defendant's BAC was attributable to his post-collision drinking and what was not. The state also points to the amount of time that had elapsed by the time that Hargis and defendant arrived at the hospital and Hargis's belief about how long it would take to obtain a warrant. The state notes that, "after everyone had returned to assist with the process," it took two and one-half hours to obtain the warrant that authorized the later blood draws. The state suggests that it would have taken even longer to obtain a warrant had Hargis begun the process at 7:30 p.m., because Hargis's supervisor and the district attorney were at the collision scene.

We start our analysis by observing that defendant's arguments on appeal implicate only the Fourth Amendment;

defendant does not make a separate argument under Article I, section 9, of the Oregon Constitution. "A blood draw is a search of the person" for purposes of the Fourth Amendment. *Mitchell v. Wisconsin*, 588 US ___, 139 S Ct 2525, 2534, 204 L Ed 2d 1040 (2019). As such, the blood draw may be conducted without a warrant only if an exception to the warrant requirement applies. In the case of blood-alcohol analysis, an exigency exception exists "when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant applica-tion." *Id*. at ___, 139 S Ct at 2537. "[T]he natural dissipa-tion of alcohol from the bloodstream does not *always* con-stitute an emergency justifying the warrantless taking of a blood sample." *Birchfield v. North Dakota*, 579 US ___, 136 S Ct 2160, 2174, 195 L Ed 2d 560 (2016) (emphasis in orig-inal; citing *Missouri v. McNeely*, 569 US 141, 156, 133 S Ct 1552, 185 L Ed 2d 696 (2013)). Rather, the existence of an exigency must be evaluated on a case-specific basis that depends on all the facts and circumstances involved. *Id*.; *see also State v. Perryman*, 275 Or App 631, 642, 365 P3d 628 (2015) (discussing *McNeely* and noting that the Court reaffirmed in that case "that a determination of whether a warrantless, nonconsensual blood draw is constitutional depends upon the totality of the circumstances in each case").

In applying that "totality of the circumstances" test, both we and the Court have emphasized the need for prompt blood testing and the practical realities that some-times may prevent police officers from obtaining blood-draw warrants expeditiously. In *Mitchell*, the Court addressed a circumstance where a driver suspected of DUII was uncon-scious and therefore could not be given an evidence-grade breath test. 588 US at ___, 139 S Ct at 2531. In holding that "the exigent-circumstances rule almost always permits a blood test without a warrant" in such circumstances, the Court noted both the heightened need for blood alcohol test-ing and that "an officer's duty to attend to more pressing needs may leave no time to seek a warrant." *Id*. at ___, 139 S Ct at 2531, 2535. On the latter point, the Court focused on the need for officers to attend to other urgent tasks "in many

unconscious-driver cases," *id*. at ___, 139 S Ct at 2538, and the Court observed that, in "the emergency scenarios created by unconscious drivers, forcing police to put off other tasks for even a relatively short period of time may have terrible collateral costs." *Id*. at ___, 139 S Ct at 2539. Thus, the Court held, only in an "unusual case" would a defendant be able to show that police "could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id*.

In *Perryman*, we affirmed a trial court's ruling denying a defendant's motion to suppress blood-draw evidence. 275 Or App at 644. A police officer had stopped the defendant after receiving a tip that the defendant had driven away from a tavern while intoxicated and, shortly after, observing him commit several traffic infractions. *Id*. at 633. During the traffic stop, the officer saw signs that the defendant was intoxicated, and he called for medical assistance after the defendant began to hyperventilate and have breathing problems. *Id*. The defendant was transported to a hospital and arrived one hour after police had received the tip about the defendant driving while intoxicated. *See id*. The defendant's blood was drawn without a warrant, over his objection, about 40 minutes later. *Id*. at 633-34.

The *Perryman* defendant moved to suppress evidence resulting from the blood draw, arguing that the state had not established that exigent circumstances justified the warrantless search. *Id*. at 634. At a suppression hearing, the state presented evidence that, "in a best case scenario, it would have taken [the officer] approximately two and one-half hours to obtain a warrant for [the] defendant's blood." *Id*. That was in part because the officer would have had to investigate what had happened at the tavern. *Id*. In addition, the officer testified, he would have had to find another officer "to watch over" the defendant, review video from his patrol car, type the affidavit, and then contact a judge. *Id*. at 634-35. The officer also testified that, had he pursued a telephonic warrant, he still would have needed to type an affidavit that he could read to a judge over the telephone, saving only the few minutes that it would have taken to drive to the judge's house. *Id*. at 635. Finally, the officer testified

"that a substantial delay in obtaining a blood sample risks the loss of BAC evidence." *Id.*

The trial court denied the suppression motion and we affirmed, rejecting the defendant's Fourth Amendment argument. Our holding was based largely on "evidence that the warrant application process would have significantly increased the delay in obtaining [the] defendant's BAC evidence." *Id.* at 642. By the time the defendant had been transported to the hospital, almost one hour had elapsed since the traffic stop, which "increased the risk of compromising the probative value of the BAC evidence." *Id.* at 643; *see id.* at 642 (noting that, "because BAC decreases gradually after a person stops drinking, 'a significant delay in testing will negatively affect the probative value of the results'" (quoting *McNeely*, 569 US at 152)). Under those circumstances, we concluded, "[i]n light of [the officer's] belief that it would have taken another two and one-half hours to obtain a warrant, it was not unreasonable for [the officer] to conclude that he faced an emergency that justified acting without a warrant." *Id.* at 643. In doing so, we rejected the defendant's argument that the officer could have begun applying for a search warrant more quickly because other officers were available to help at the scene, noting that the record did not support the defendant's suggestion that the officer "could have obtained additional help and chose not to," and explaining that related factual determinations "were for the trial court to consider in the first instance." *Id.* at 644 n 4.

*Perryman* guides our decision in this case. As in *Perryman*, both evidence and established law support a determination that additional passage of time would have compromised the value of BAC testing. Hargis testified that, at the point that he administered FSTs—about two hours after the collision—he already was concerned about blood alcohol dissipation and the corresponding loss of evidence. More than another half-hour had passed by the time a phlebotomist arrived at the hospital to draw defendant's blood. Thus, the record supports the trial court's implicit determination that, as in *Perryman*, the delay that had already occurred since the collision itself contributed to an exigent need for a prompt blood draw. *See id.* at 643 ("By the time that [the] defendant arrived at the hospital, approximately

one hour had elapsed since [an officer] initiated the stop. In light of [the officer's] belief that it would have taken another two and one-half hours to obtain a warrant, it was not unreasonable for [the officer] to conclude that he faced an emergency that justified acting without a warrant.").

Moreover, as in *Perryman* (and *Mitchell*), the record supports the trial court's determination that significant additional delay—beyond the two hours that had already passed—would have resulted had Hargis attempted to obtain a warrant before defendant's blood was drawn. Hargis testified in detail about why he was unable to immediately apply for a warrant, and he also explained how long it would have taken to obtain a warrant (over two more hours) even if he had begun the process immediately after arriving at the hospital. The record also includes evidence, including the testimony of Hargis and other involved officers, supporting the trial court's finding that other officers' unavailability "compounded" the amount of time it would have taken to get a warrant. In addition, the record includes evidence about how long it *actually* took Hargis to obtain such a warrant later the same evening: He spent two and one-half hours drafting and processing an affidavit, then obtaining a warrant for the two blood draws that occurred after the unwarranted blood draws, once the district attorney was available to assist.

That evidence adequately supports the trial court's findings, as set out in its letter opinion, about the need for prompt blood draws and the additional delay that would have been caused if Hargis had applied for and obtained a search warrant before the draws occurred. Under *Perryman* and *Mitchell*, those circumstances created an exigency of sufficient magnitude to justify the warrantless blood draws under the Fourth Amendment.

Defendant's arguments on appeal are based largely on assertions that the trial court necessarily rejected. For example, the trial court was not required to accept defendant's contention that—despite Hargis's contrary testimony—it would have been safe and practical for Pore to secure defendant by himself, so that Hargis could have started the warrant application process earlier in the evening. Nor was

the court required to determine that, if Hargis had started drafting an affidavit sooner, he could have obtained a warrant so quickly that blood-alcohol dissipation would not have been a significant issue. Defendant's arguments implicitly ask us to reject the trial court's factual findings on those points, which we will not do, given that the record supports them. *See id.* at 644 n 4 (rejecting the defendant's argument that a police officer could have applied for a warrant if he had obtained help from other officers who were available to assist; noting that the record did not support the defendant's argument that the officer "chose" not to obtain help and explaining that such "factual suppositions" are "for the trial court to consider in the first instance"). Defendant's third assignment of error therefore presents no basis for reversal.

We turn to defendant's fourth assignment of error, in which he challenges the trial court's award of restitution to D. In addressing defendant's arguments, "[w]e review whether [the] trial court complied with the requirements for imposing restitution for errors of law." *State v. Buswell*, 308 Or App 389, 390, 479 P3d 341 (2021). For purposes of that analysis, we accept the trial court's express and implicit factual findings as long as any evidence in the record supports them, viewing the evidence in the light most favorable to the state. *Id.* We describe the restitution proceedings in keeping with that standard of review.

Following the entry of defendant's conditional guilty plea, the state sought restitution to D, consisting primarily of the victim's salary and benefits for a school year (she had been a teacher), funeral expenses, and the value of her bicycle. Defendant objected on the ground that "[t]he victim's estate, as represented by her husband, signed a complete release waiving 'any and all known or unknown personal injuries and property damage'" that resulted from the collision. Defendant based that objection on a settlement and release agreement between defendant's insurer and the victim's estate, which provided, in part:

"FOR AND IN CONSIDERATION of the payment to me *** of the sum of [$50,000] ***, I, [D], for the estate of [victim] *** do hereby release, acquit and forever discharge [defendant, another individual, and defendant's insurer]

of and from any and all actions, causes of action, claims, demands, costs, loss of services, expenses and compensation, on account of, or in any way growing out of, any and all known and unknown personal injuries and property damage resulting or to result from an accident that occurred on or about the 30th day of August in or near, Lakeview Oregon.

"* * * * *

"In consideration of the payment of the aforesaid moneys, Releasor agrees to indemnify Releasees and agrees to save them harmless of and from any and all claims having to do with, or in any way arising out of, the above-described accident."

Defendant argued that "the $50,000.00 insurance settlement [was] full satisfaction just as the release says, is full satisfaction for the injuries and—it's even broader than that, it encompasses everything." In the alternative, defendant argued that, even if the release did not "nullif[y] restitution," there should be an "offset" for the $50,000 paid by defendant's insurer.

In support of the restitution request, the state presented evidence of economic losses that D suffered because of his wife's death, including the loss of the income and benefits that she received as a teacher, funeral expenses, and the value of the bicycle she was riding when defendant hit her. Responding to defendant's contention that the release agreement precluded a restitution award, the state emphasized that it was seeking restitution for D as an individual victim of defendant's crimes. The state argued that the release agreement that D signed was on behalf of the manslaughter victim's estate, which was "a separate victim from [D]." Accordingly, the state argued, the release would not bind D "from bringing a civil claim for economic damages as a victim in his own right" and, therefore, the release did not preclude an award of restitution. The state also observed that "there was nothing itemized in that $50,000.00" indicating what specific losses were covered by the insurance payment.

The trial court awarded restitution of $101,335.74, ruling that D did not lose his status as a victim for purposes

of the restitution statute "by his actions as a representative of the estate." That is, the court ruled, D "released the defendant from further damages that *the estate* [might] recover in a civil action" but "did not waive his [own] right to receive economic damages as a victim in the criminal case." The trial court further explained that no evidence was presented "that the $50,000 payout was itemized to specifically cover the economic damages suffered by" D, noting that damages in a civil lawsuit brought by the estate could have exceeded $50,000 and "would not have been limited to [D's] economic loss."

On appeal, defendant again argues that the release agreement precludes any award of restitution to D because, in light of that agreement, "there could be no further civil liability for" the victim's death. In the alternative, defendant argues "that any restitution award must be offset by the $50,000 already paid to the estate of [the victim]." In response, the state argues, among other things, that D and the victim's estate are different victims and that D's release on the estate's behalf therefore does not preclude a restitution award to him as an individual.

We recently summarized the principles governing restitution awards in *State v. Skeen*, 309 Or App 288, 481 P3d 402 (2021):

> "Crime victims are entitled to restitution for 'economic damages' caused by a defendant's crime. ORS 137.106(1)(a); *see also* Or Const, Art I, § 42(1)(d) * * *. 'Economic damages' has 'the meaning given that term in ORS 31.710,' except that it excludes future impairment of earning capacity. Thus, for restitution purposes, 'economic damages' means
>
> "'objectively verifiable monetary losses * * *. [ORS 31.710(2)(a)]'
>
> "Ultimately, 'for the purposes of the restitution statutes, economic damages are objectively verifiable out-of-pocket losses that a person could recover against the defendant in a civil action arising out of the defendant's criminal activities.'"

*Id*. at 292-93 (some citations and internal quotation marks omitted).

The argument that defendant makes on appeal is narrow. Defendant does not challenge the state's itemization of D's "objectively verifiable monetary losses"; nor does he contend that the state did not prove the magnitude of those losses. Defendant also does not argue that any *specific* claimed item of economic damages (such as the value of the victim's bicycle) was necessarily covered by the payment that defendant's insurer made to the victim's estate, such that D cannot be said to have incurred an "out-of-pocket" loss for that item. Rather, defendant contends only that the settlement agreement that D signed on behalf of the victim's estate necessarily precludes a restitution award in D's favor, because "the estate of [the victim] would have no further action as [the settlement agreement] is a complete release of all of Defendant's liability for any cause of action or claim."[4]

The difficulty with defendant's argument is that it does not grapple with the distinction between D as an individual victim and D as the person who settled civil claims against defendant on the estate's behalf. As a general principle, the personal representative of an estate "is a *distinct legal entity* from the individual who performs that role and, as such, the personal representative and not the individual is the appropriate party in actions on behalf of and against the interests of a decedent or estate." *Johnson v. Manders*, 127 Or App 147, 150, 872 P2d 420, *rev den*, 319 Or 149 (1994)

---

[4] Again, we emphasize that defendant has not identified any specific losses incurred by the estate (1) that, in practical terms, were suffered by D (rather than by any other beneficiaries of the victim's estate), and (2) for which D was compensated by the $50,000 insurance payment, so that he at least arguably did not suffer out-of-pocket loss. As the trial court pointed out, on this record, it is possible that the estate may have suffered losses that D himself cannot be said to have incurred. Similarly, D may have suffered losses distinct from and beyond those suffered by the estate. We do not foreclose the possibility that, in another case, the record might establish that a victim has suffered no out-of-pocket losses because the victim was reimbursed through payments from a settlement agreement. The record simply does not establish that here. Accordingly, we need not—and do not—address what legal significance would attach to any such settlement.

Defendant attempted to raise an additional theory at oral argument, where he asserted for the first time that "unitary victim" principles pertinent to wrongful-death actions should apply in this case. We decline to address that belatedly presented and undeveloped argument. *See Colton and Colton*, 297 Or App 532, 547-48, 443 P3d 1160 (2019) ("We do not consider appellate arguments—even if properly preserved—that are made on appeal for the first time during oral argument.").

(emphasis in original).[5] More specific to this context, the restitution statutes also distinguish between individual crime victims and the estates of such victims, defining a victim entitled to restitution to include *both* a "person * * * whom the court determines has suffered economic damages as a result of the defendant's criminal activities," ORS 137.103(4)(b), *and*, upon the death of an individual crime victim who has suffered economic damages, "the estate of the victim." ORS 137.103(4)(e). Those statutes reflect the principle that a decedent's estate may be a victim, with its own losses, distinct from any other victims (such as the decedent's spouse) who have their own losses.

The distinction between an individual victim of criminal activity and the estate of a victim is significant in this case. When D signed the settlement and release agreement, he did so on behalf of his wife's estate, not in his individual capacity. Accordingly, that agreement does not release claims that D had for his own losses—as opposed to the estate's losses—caused by defendant's criminal conduct.[6]

Again, the only argument that defendant has developed on appeal is that the settlement and release agreement between defendant and the manslaughter victim's *estate* necessarily precludes or should reduce an award of restitution to D, the victim's *spouse*. Defendant does not base that argument on any facts specific to this case (other than the

_____

[5] In this case, the record does not reflect whether D had been formally named as personal representative of the estate. However, the trial court found as fact that D was acting "as a representative of the estate" when he signed the settlement agreement, and the record supports that finding. The point is essentially the same as that made in *Johnson*—actions taken by (or against) a person who is acting as the representative of the estate are not the same as actions that the person takes (or is subject to) in his or her own individual capacity.

[6] For that reason, this case differs materially from *State v. Rodriguez*, 88 Or App 429, 745 P2d 811 (1987), *rev den*, 305 Or 577 (1988), on which defendant relies. In *Rodriguez*, the defendant settled a claim with the victim's insurance company for damages to the victim's automobile (for which the victim's insurer paid) that were caused by defendant's criminal activity (DUII). *Id*. at 431. We held that, having settled with the victim's insurer, the defendant could not also be required to pay restitution to the insurer. *Id*. at 432. But *Rodriguez* did not involve a situation like that present in this case, where the defendant settled with a decedent's estate and the restitution claim is on behalf of a different, individual, victim. Moreover, the restitution statutes have been amended significantly since *Rodriguez* was decided. For both of those reasons, *Rodriguez* does not control here.

existence of the settlement agreement); rather, he offers it as a universally applicable proposition. We find no support in the law for that contention, and we reject it in light of the principles discussed above.

Affirmed.